## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TAKTL, LLC** a limited liability company, | ) |
| | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | )   2:18cv1546 |
| | )   **Electronic Filing** |
| **IWR, NORTH AMERICA, LLC** | ) |
| a limited liability company formerly known | ) |
| as IWR BUILDING SYSTEMS, LLC and | ) |
| **ALLIANCE GLAZING** | ) |
| **TECHNOLOGIES, INC.** | ) |
| | ) |
| Defendants/Counterclaim Plaintiffs. | ) |

## OPINION

TAKTL, LLC ("TAKTL" or "plaintiff") commenced this civil action against IWR North America, LLC ("IWR"), and Alliance Glazing Technologies, Inc. ("AGT") (collectively "defendants") for the breach of a commercial construction contract involving the manufacture of specialty concrete panels.  Defendants asserted counterclaims for breach of contract and related damages.  The parties have moved to exclude the testimony of several prospective expert witnesses pursuant to Daubert v. Dow Chemical, 509 U.S. 579 (1993).  Presently before the court are plaintiff's motions to exclude the testimony of defendants' shop drawing experts, David Nasser and Christopher Kercsmar (ECF No. 178) and Dean Rutila (ECF No. 180), and defendants' motion to exclude the testimony of plaintiff's shop drawing expert, Jeffrey Somerlot (ECF No. 187).  For the reasons set forth below, the motions will be denied.

### I.     Background

This action arises out of two contracts: one between IWR and TAKTL and one between AGT and TAKTL.  Both contracts relate to construction projects at the Barnes Jewish Hospital North Building and the St. Louis Children's Hospital Building in St. Louis, Missouri (the "Project").  TAKTL supplied exterior enclosure panels for these buildings to AGT and IWR, two

subcontractors for the Project.  Generally, TAKTL has brought breach of contract claims against AGT and IWR for failure to pay for the panels.  AGT and IWR have asserted counterclaims for failure to manufacture the panels timely and accurately according to the Project's specifications and to deliver them sequentially in accordance with the contractually required schedule.

AGT executed Purchase Order No. 15-1754 with TAKTL on or about March 20, 2015 ("AGT Purchase Order").  IWR executed Purchase Order No. 2254 with TAKTL on or about August 26, 2015 ("IWR Purchase Order").  The terms of both Purchase Orders required TAKTL to produce certain quantities of pre-fabricated glass fiber reinforced concrete panels and to deliver those panels for assembly in accordance with the Project's schedule in exchange for payment.

The Project required panels of various configurations, sizes, and colors that needed to be installed in a particular sequence.  As such, the manufacture, assembly, and installation processes needed to be specified and coordinated from the outset to minimize the risk of errors and delays. To do so, "shop drawings" of the panels were to be created.  For each component of a structure, construction projects use shop drawings to communicate an actionable roadmap to the various parties involved in the manufacture-to-installation chain.  In this case, the shop drawings for the panels were to depict the dimensional, design, and anchor details necessary for fabrication and installment.  These drawings would then be converted into "fabrication tickets" that would enable TAKTL's personnel and machinery to manufacture the panels.

Under the terms of the AGT Purchase Order, fabrication tickets would be furnished directly to TAKTL.  ECF No. 146 ¶ 23.  It also provided the dates by which AGT would submit "Record Set" drawings to TAKTL.  ECF No. 179-2 at 9–10.  As for IWR, it subcontracted with Wheaton & Sprague Engineering, Inc. ("Wheaton") to produce the shop drawings for its panels, from which TAKTL was responsible for creating its own fabrication tickets.  ECF No. 146 ¶ 24.  The IWR Purchase Order provided that TAKTL would "commence the [w]ork . . . from the date of receipt

of deposits, final shop drawings and written notice to proceed." ECF No. 179-1 at 13. IWR provided multiple sets of shop drawings to TAKTL between December 2015 and May 2016, followed by updates over the next several months. ECF No. 146 ¶ 35.

One of the principal issues is whether the shop drawings IWR and AGT provided to TAKTL included the necessary information for TAKTL to begin manufacturing the panels in accordance with the contract schedule. TAKTL alleges that defendants provided untimely, deficient, and inaccurate drawings in a piecemeal fashion that made it impossible to manufacture the panels in an efficient and timely manner. ECF No. 179 at 5. Defendants deny this allegation and contend it is a post hoc excuse concocted for this litigation. ECF No. 188 at 4.

**A. Plaintiff's Motion to Exclude David Nasser and Christopher Kercsmar**

Defendants retained the Consulting Engineers Group ("CEG") to review the drawings for the glass fiber reinforced concrete ("GFRC") handset panels developed by Wheaton. ECF No. 179-3 at 2. Upon reviewing these materials, David Nasser and Chris Kercsmar, two engineers at CEG, offered their opinions in a report ("CEG Report") and provided deposition testimony regarding the same. Nasser and Kercsmar concluded that the sets of drawings IWR submitted to TAKTL on January 15, 2016 ("the January Drawings") were "high quality" and "sufficient for use in the detailing of fabrication drawings for the handset GFRC panels." ECF No. 179-3 at 17. TAKTL moves to exclude Nasser and Kercsmar's expert testimony as failing to comply with Federal Rule of Evidence 702 and the requirements of Daubert.

TAKTL asserts that Nasser and Kercsmar's expert testimony must be excluded because it is unreliable and insufficiently tied to the facts of the case. Under Federal Rule of Evidence 702, trial courts must act as "gatekeeper" and exercise discretion to preclude expert testimony that is unreliable, irrelevant, or unhelpful to the jury. Daubert, 509 U.S. at 597. In the Third Circuit, district courts must focus on the "trilogy of restrictions on expert testimony: qualification,

reliability and fit." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316 (3d Cir. 2003).  Thus, district courts should permit expert testimony so long as: (1) the expert has the necessary qualifications, (2) the testimony is based on reliable methods, and (3) the testimony would assist the trier of fact in understanding the evidence or in resolving factual issues.  See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741–43 (3d Cir. 1994) ("Paoli II").[1]

   With respect to reliability, TAKTL argues that Nasser and Kercsmar failed to use a methodology beyond their own intuition to reach their opinions.  And as for "fit," TAKTL asserts that because Nasser and Kercsmar did not apply the standards set forth in the Purchase Orders to evaluate the quality of the shop drawings and instead used extraneous industry standards, their testimony is insufficiently tied to the facts of the case and usurps the court's role in explaining "the standard of care or obligations of the contracting parties."  ECF No. 179 at 14.

   Defendants counter that the reliability of Nasser and Kercsmar's testimony is derived from their practical experience, specialized knowledge, and qualitative assessment of the technical drawings at issue.  Further, they argue that because the Purchase Orders do not set forth an industry standard for the quality of the shop drawings, Nasser and Kercsmar's reliance on outside standards in evaluating the drawings fits the needs of the case.

   TAKTL's contention that Nasser and Kercsmar's expert testimony fails to satisfy the reliability and fit requirements is misplaced.  The court finds that Nasser and Kercsmar's opinions meet the foundational requirements for admission under Rule 702 and the requirements of Daubert. The court's rationale follows.

---

[1] This opinion applies the current version of Rule 702, which was most recently amended on December 1, 2023.  "The amendment does not substantively alter Rule 702, but rather 'clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard.'"  S.Y. v. Roman Cath. Diocese of Paterson, No. 20CV2605 (EP) (CLW), 2024 WL 1231333, at *2 (D.N.J. Mar. 21, 2024) (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendments).

Initially, Nasser and Kercsmar possess the requisite qualifications.  To qualify as an expert, the witness must possess specialized expertise, gained from "practical experience as well as academic training and credentials" in the relevant area.  Jones v. Swepi L.P., 643 F. Supp. 3d 547, 561 (W.D. Pa. 2022) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).  Although TAKTL does not contest Nasser and Kercsmar's qualifications, they are pertinent to the reliability and fit of their testimony, which are challenged.  Grasinger v. Caterpillar, Inc., No. CV 21-956, 2023 WL 4846843, at *9 (W.D. Pa. July 28, 2023).

Both Nasser and Kercsmar have bachelor's degrees in civil engineering and are licensed professional engineers with twenty-five years of experience.  ECF Nos. 195-1, 195-2.  Nasser also has a civil engineering master's degree with a specialty in structures and he focuses his structural engineering practice in precast concrete.  ECF No. 195-1 at 4.  Kercsmar specializes his work in the development of project documents and precast/prestressed concrete specialty engineering.  ECF No. 195-2 at 2.  CEG provides various engineering services, but its primary area of specialization is the design and development of shop and piece fabrication drawings for structural precast concrete components, architectural panels, and specialized concrete panels, including GFRC products.  ECF No. 179-3 at 2.  Nasser and Kercsmar have gained specialized expertise in hand-set panel drawings from their education, licensing, and years of experience working on projects involving precast panels.  Thus, they are qualified under Rule 702 to render opinions on the adequacy of the GFRC hand-set panel drawings.

Next, Nasser and Kercsmar's testimony is reliable.  The reliability inquiry is a flexible one wherein the court must focus solely on the expert's chosen principles and methodology rather than the conclusions drawn therefrom.  Daubert, 509 U.S. at 594–95.  "To be reliable, the expert's opinion must be premised on more than mere subjective belief or unsupported speculation; the expert must have good grounds for his or her belief."  Marcum v. Columbia Gas Transmission,

LLC, 549 F. Supp. 3d 408, 416 (E.D. Pa. 2021) (quoting Paoli II, 35 F.3d at 742) (internal quotation marks omitted).

Whether "good grounds" support an expert's potential testimony depends on various factors, including: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." Jones, 643 F. Supp. 3d at 562 (quoting Pineda v. Ford Motor Co., 520 F.3d 237, 247–48 (3d Cir. 2008)).   But these factors are not exhaustive and some may be more or less applicable depending on the case.  See Pineda, 520 F.3d at 248.   Trial courts have broad latitude in determining whether these specific factors are "reasonable measures of reliability in a particular case."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999).

TAKTL argues that Nasser and Kercsmar's proffered testimony is unreliable because it is based entirely on their intuition.  ECF No. 179 at 12.  It emphasizes that Kercsmar could not identify how *many* errors and omissions it would take to render the shop drawings below average quality.  ECF No. 179-4 at 6:19–7:19.  But when "the reliability of testimony from a practical expert depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it," courts have generally found that the Daubert factors, such as potential error rate, "simply are not appliable."  Jones, 643 F. Supp. 3d at 562 (quoting Elgert v. Siemens Indus., Inc., No. CV 17-1985, 2019 WL 1294819, at *5–6 (E.D. Pa. Mar. 20, 2019)). Instead, the focus is on the degree to which the expert's training and experience is brought to bear on the inquiry at hand.

Nasser and Kercsmar's opinions and testimony are based on their years of experience as civil engineers, as well as their prior work detailing fabrication drawings from shop drawings for GFRC products.  ECF No. 179-3 at 2; see also ECF No. 179-4 at 5:22–25 ("We looked at it as if we were taking on this job, how would we staff it . . . how would we approach it from a clarification standpoint.").  In addition to 121 drawings from Wheaton, Nasser and Kercsmar also reviewed a sampling of TAKTL's fabrication tickets and the architectural drawings from which the shop drawings were developed.  ECF No. 179-3 at 3–4.  The CEG Report includes a representative example of a TAKTL fabrication ticket to demonstrate the pertinent information needed to fabricate a particular panel, then it identifies that information in the ticket's corresponding shop drawings.  Id. at 4–10.  The Report also references the necessary information that a shop drawing for an exterior panel should contain, as stated in the Precast/Prestressed Concrete Institute's "Recommended Practice for Glass Fiber Reinforced Concrete Panels," as well as the "standards of care" articulated by The American Council of Engineering Companies, The Council of American Structural Engineers, and The American Institute of Architects.  Id. at 16.

In sum, Nasser and Kercsmar used their practical experience to assess the quality of the technical drawings at issue.  As Kercsmar explained, their opinions turned on the type and nature of the deficiencies, rather than their quantity or frequency.  ECF No. 179-4 at 7:10–15.  Stated differently, the number of errors or omissions is simply "not appliable" here.  Jones, 643 F. Supp. 3d at 562.  Thus, it does not follow that their testimony is inherently unreliable simply because they could not pinpoint the number of deficiencies that would have rendered the shop drawings unacceptable.  Moreover, Nasser and Kercsmar drew on accepted industry standards in formulating their opinions.  Accordingly, the court finds that Nasser and Kercsmar's opinions are sufficiently premised on their knowledge, experience, and facts in the record to satisfy the reliability prong.

Finally, Nasser and Kercsmar's testimony fits because there are good grounds to believe it would help the jury decide a factual dispute.  To determine whether an expert's testimony "fits" the proceedings, the trial court asks "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." United States v. Schiff, 602 F.3d 152, 173 (3d Cir. 2010) (quoting Daubert, 509 U.S. at 591).  This requirement goes primarily to relevance. See Daubert, 509 U.S. at 591.  Even if an expert's testimony is based on their specialized knowledge, "the testimony will be excluded if it is not knowledge related to the purposes of, or pertinent inquiry to, the case." Jones, 643 F. Supp. 3d at 563.  Nasser and Kercsmar's testimony meets this requirement: it directly addresses one of the fundamental factual disputes in this litigation, *i.e.*, whether the shop drawings IWR provided to TAKTL included the necessary information for TAKTL to begin manufacturing the panels and to continue doing so in a timely and sequential manner.

While Federal Rule of Evidence 704 permits expert testimony to embrace an ultimate issue that the trier of fact will decide, Nasser and Kercsmar may not offer legal conclusions.  See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006).  "Such testimony . . . would usurp the District Court's pivotal role in explaining the law to the jury." Id. (citing First National State Bank v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981)).  However, experts may testify about the customs and practices of a particular industry, so long as they do not give an opinion as to the legal duties arising therefrom. See Orbital Eng'g, Inc. v. Buchko, 578 F. Supp. 3d 727, 734 (W.D. Pa. 2022).

TAKTL argues that the different "standards of care" referenced in the CEG Report are not relevant to the issue of "whether Defendants complied with their contractual obligations" to provide "final" and "Record Set" shop drawings.  ECF No. 179 at 14.  TAKTL further contends

8

that by using these standards, Nasser and Kercsmar usurp the court's role in explaining the law to the jury. Id. These arguments are unavailing.

First, the Purchase Orders do not define "final" or "Record Set" drawings, nor do they set forth any industry guidelines or standards for measuring the quality of the shop drawings. As a result, the CEG Report does not disregard critical contractual terms, but instead merely highlights standard practices in the construction industry and evaluates the quality of the shop drawings in relation to those practices. Notably, TAKTL's expert witness also relied upon external industry standards in assessing the quality of the shop drawings—including the same recommended practice from the Precast/Prestressed Concrete Institute used in the CEG Report. See ECF No. 195-5 at 10–11. Thus, TAKTL's contention that defendants' experts impermissibly explain the law to the jury is significantly undermined by its own proffered expert testimony. See Carnegie Mellon Univ. v. Marvell Tech. Grp., Civ. A. No. 09-290, 2012 WL 3686736, at *5 (W.D. Pa. Aug. 24, 2012) (denying Daubert motion, in part, given that moving party had introduced its own expert on same basis and commenting that "[w]hat's good for the goose is good for the gander.").[2]

Second, "[e]vidence of industry custom or trade usage is always relevant and admissible in construing commercial contracts, and does not depend on the existence of ambiguity in the contractual language." Gen. Refractories Co. v. First State Ins. Co, 855 F.3d 152, 160 (3d Cir. 2017) (internal quotation marks and citation omitted). "This means that, regardless of the purported clarity or ambiguity of various contractual terms, evidence of custom or trade usage is generally admitted." T.N. Incorporation, Ltd. v. Fid. Nat'l Info. Servs., Inc., No. CV 18-5552, 2021 WL 5980048, at *13 (E.D. Pa. Dec. 17, 2021). Thus, even if the language of the Purchase

---

[2] To the extent that TAKTL believes that Nasser and Kercsmar have "incorrectly defined the relevant industry," their "conclusions remain subject to cross-examination." Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 286 F.R.D. 266, 272 (W.D. Pa. 2012).

Orders was unambiguous, Nasser and Kercsmar's testimony as to industry customs and standards will still be relevant.

Given the parties' conflicting views of what constitutes a "sufficient" shop drawing, Nasser and Kercsmar's testimony about the construction industry's standards, customs, and practices, and their application of the same to the shop drawings, are appropriate expert assessments. See First Nat. State Bank of New Jersey, 668 F.2d at 731.  The court concludes that the standards promulgated by the national engineering and architectural organizations in the CEG Report will aid the jury in determining the level of information TAKTL needed to begin manufacturing the panels and whether Wheaton's shop drawings sufficiently supplied that information.

Having established that Nasser and Kercsmar are qualified experts, their opinions are sufficiently reliable, and there are good grounds to believe that the testimony will be helpful to the jury, defendants have met the foundational requirements for admission under Rule 702. Accordingly, plaintiff's Daubert motion to exclude their report and testimony will be denied.

### B.  Defendants' Motion to Exclude Jeffrey Somerlot

TAKTL retained Vidaris to provide an "independent expert opinion on the quality and delivery of [the] shop drawings" AGT and IWR provided to TAKTL. ECF No. 188-6 at 4.  Jeffrey Somerlot ("Somerlot") of Vidaris produced a report (the "Vidaris Report") concluding, *inter alia*, that the shop drawings were inaccurate, incomplete, and late. Id. at 40.  Defendants' rebuttal expert, Dean A. Rutlia, authored a report (the "Rutlia Report") disputing Somerlot's opinions.  Somerlot then authored two rebuttal reports in response to the CEG Report and the Rutlia Report. Defendants move to exclude Somerlot's reports and proffered testimony as failing to satisfy Rules 702 and 403 and the requirements of Daubert.

Defendants have not set forth a persuasive basis to exclude the entirety of Somerlot's testimony and reports.  Like TAKTL, defendants challenge Somerlot's application of "outside"

10

industry standards in assessing the quality of the shop drawings because they are "unmoored" from the contractual requirements, "subjective," and "irreconcilable with any peer-reviewed or generally accepted methodology." ECF No. 188 at 18–19. Defendants further argue that Somerlot's testimony does not "fit" the facts of the case because it bolsters TAKTL's "after-the-fact breach of contract claim" that "was not, in actuality," the cause of its failure to perform. Id. at 15. Finally, defendants contend that the summaries of emails between TAKTL and IWR employees in the Vidaris Report amount to a needless presentation of cumulative evidence.

In response, TAKTL asserts that Somerlot's analysis was primarily based upon the language of the Purchases Orders and that the inclusion of additional industry standards in the Vidaris Report merely strengthens the conclusions therein. With respect to the relevancy and cumulative risk of Somerlot's opinions, TAKTL counters that these arguments are premature, speculative, and premised upon key disputed facts.

At the outset, Somerlot is qualified to offer expert opinions regarding the quality of the shop drawings. He has a bachelor's degree in mechanical engineering and approximately twenty years of experience advising "developers, architects, and manufacturers on every aspect of complex envelope development." ECF No. 188-6 at 41. Somerlot is a professional engineer, registered architect, and the head of the Building Envelope, Energy and Code Advisory service lines at Vidaris. Id. As an exterior façade consultant, Somerlot's areas of expertise include, *inter alia*, unitized curtain wall, window wall, and architectural precast panels. Id. He has served as a façade consultant on domestic and international projects since 2003, including on the World Trade Center Towers 1 and 3, where he oversaw the façade systems' design, shop drawing, fabrication, and installation stages. Id. at 5; ECF No. 191-13 at 4:9–17. He also conducted a technical performance review of the façade shop drawings for a multi-story hotel, which entailed cross-referencing the project's specifications with architectural drawings "to confirm [the] components

11

were consistent with the proposals from the contractor." ECF No. 191-13 at 3:15–25. All told, this court finds that Somerlot's education, professional licensing, and years of experience as a consultant sufficiently demonstrate his specialized expertise in exterior façades. Therefore, he is qualified under Rule 702 to render an expert opinion on the adequacy of the shop drawings.

Turning to reliability, the court finds that plaintiff has shown by a preponderance of the evidence that Somerlot's testimony is sufficiently premised on good grounds. Like Nasser and Kercsmar, Somerlot used his knowledge, experience, and facts in the record to evaluate the quality of the shop drawings. Indeed, the methodology Somerlot employed to draw his conclusions is almost identical to the process Nasser and Kercsmar used: he compared the multiple sets of shop drawings with the architectural drawings, industry standards, and project specifications. And because defendants attack the reliability of Somerlot's testimony on the same grounds that were raised against Nasser and Kercsmar, their arguments fail for the same reasons previously discussed.

The only seemingly different argument defendants raise with respect to reliability is still a relatively reiterative issue. Rather than attacking the industry standards Somerlot referenced in his report as irrelevant, defendants argue that his opinions are unreliable because the standards he used are "conclusory and inherently subjective." ECF No. 188 at 16. Defendants emphasize that Somerlot admitted that "reasonably minded experts could disagree as to the standard of care that applied to the Project," and "could apply the same standard of care in reviewing a set of drawings on a project" and reach different conclusions as to whether it had been met. Id. at 18.

The court rejects defendants' argument. The Daubert inquiry is not focused on whether an expert's conclusions are correct, but whether they are reliable. See Paoli II, 35 F.3d at 744. The potential for disagreement among experts does not mean that the different industry standards are unreliable considerations in their evaluations. The testimonies of both parties' experts make clear

that their opinions were not solely based on these standards—they were simply one factor among many that went into their analyses. And "[w]hether or not that analysis is correct is ultimately a question for the jury." Moore v. Combe Inc., No. CV 22-320, 2023 WL 7089940, at *4 (E.D. Pa. Oct. 26, 2023). Accordingly, the court finds that Somerlot's opinions are sufficiently premised on his knowledge, experience, and facts in the record to satisfy the reliability prong.

Next, Somerlot's testimony fits because it addresses the quality of the shop drawings IWR and AGT provided to TAKTL, which is one of the fundamental factual disputes in this litigation. Defendants argue that Somerlot's testimony fails the "fit" prong because the quality of the shop drawings "was not, in actuality," the cause of TAKTL's failure to perform and the record is devoid of any contemporaneous support for his conclusions to the contrary. ECF No. 188 at 15. According to defendants, TAKTL proceeded with fabrication upon its receipt of shop drawings in December 2015 and January 2016, but it did not raise any concerns regarding the shop drawings until August 2016. Id. at 14. Therefore, defendants contend, Somerlot is "espousing an after-the-fact breach of contract claim" against defendants. Id. at 15.

Notwithstanding this argument, as an expert witness, Somerlot is "permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury" and also "a proper subject for cross-examination." Walker v. Gordon, 46 F. App'x 691, 695–96 (3d Cir. 2002). Defendants' objection as to the "fit" of Somerlot's report and testimony "depends on questions of fact that go to weight of the evidence (and also directly to the merits, it would seem), not its admissibility." Dzielak v. Whirlpool Corp., No. CV2120089KMJBC, 2017 WL 1034197, at *20 (D.N.J. Mar. 17, 2017). Somerlot's evaluation of the shop and architectural drawings, industry standards, Purchase Orders, email communications, and project specifications "indicates a solid foundation for his opinions." Breidor v. Sears, Roebuck & Co., 722 F.2d 1134, 1139 (3d Cir. 1983). Accordingly, the court finds that the record

13

reflects a sufficient factual foundation for Somerlot's opinion testimony such that Daubert's fit requirement is satisfied.

Finally, defendants argue that Somerlot's testimony should be excluded under Rule 403 as a needless presentation of cumulative evidence because he summarized "a collection of email questions, complaints, and other requests for information" from TAKTL employees in the Vidaris Report. ECF No. 188 No. 19.  In particular, defendants object to Somerlot's reliance on a "Shop Drawing Deficiency Log" (the "Deficiency Log") created by "an executive at TAKTL who was not involved in the day-to-day work on the Project."  Id.  Defendants claim that the Deficiency Log "summarizes various alleged deficiencies" identified by this executive "based on her review of emails primarily authored by individuals at TAKTL who were involved in the Project."  Id. Some of these individuals were listed as potential witnesses in TAKTL's August 2022 Pretrial Statement, but others were not.  See ECF No. 140 at 15–18.  Therefore, defendants argue that Somerlot's testimony would unfairly lend credence to certain facts that plaintiff has selectively provided to him through "otherwise inadmissible hearsay," which would prejudice the jury's resolution of "credibility issues" and "legal determinations."  Id. at 20.

The court finds that the record is not sufficiently developed to consider defendants' argument regarding the cumulative effect of Somerlot's testimony.  Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

Per the court's Trial Management Order filed on January 5, 2024, the parties have yet to submit any motions in limine or finalized witness and exhibit lists.  See ECF No. 173.  The Third Circuit has held that "in order to exclude evidence under Rule 403 at the pretrial stage, a court

must have a record complete enough on the point at issue to be considered a virtual surrogate for a trial record." In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 859–60 (3d Cir. 1990) ("Paoli I").

Since the record in this matter does not meet this standard, the court declines to conduct a Rule 403 balancing test of Somerlot's testimony at this time.  See Wolfe v. McNeil-PPC, Inc., No. CIV.A. 07-348, 2011 WL 1673805, at *5 (E.D. Pa. May 4, 2011) (declining to address whether the testimony of three expert witnesses was unduly cumulative under Rule 403 where plaintiff had not yet identified which of her experts she intended to call at trial); see also Freedom Mortg. Corp. v. LoanCare, LLC, No. CV1602569RMBAMD, 2023 WL 2570201, at *17 (D.N.J. Mar. 20, 2023) ("However, the Court will revisit its ruling and entertain an objection that Bryar's testimony would be cumulative, provided that appropriate circumstances obtain at trial.").  Because "no harm is done" by admitting evidence at the pretrial stage, the court finds that Rule 403 is not an appropriate basis to exclude Somerlot's testimony at this stage in the proceedings.[3]  Paoli I, 916 F.2d at 859.

Insofar as defendants can be understood to argue that Somerlot's testimony should be excluded because he relied upon hearsay, this argument fails under Rule 703.  With respect to an expert's reliance on inadmissible evidence, Rule 703 provides that:

---

[3] The court notes that, "had the issue properly been raised," it "may have been inclined to preclude" other portions of Somerlot's opinions, "namely, those that may amount to legal conclusions." Rhoads Indus., Inc. v. Shoreline Found., Inc., No. CV 15-921, 2021 WL 2778562, at *29 (E.D. Pa. July 2, 2021).  See, e.g., ECF No. 188-6 at 6 ("According to TAKTL's Purchase Orders with AGT and IWR, TAKTL's contractual responsibilities are . . . "); id. at 40 ("AGT and IWR did not meet their contractual obligations to TAKTL as indicated in the Purchase Orders.").  However, the issue as to whether these particular opinions should be precluded as impermissible legal conclusions was not properly raised in defendants' motion. But the court's resolution of this motion is without prejudice to defendants' ability to raise such an objection should Somerlot attempt to offer a legal conclusion at trial. See T.N. Incorporation, Ltd., 2021 WL 5980048, at *14 ("[E]xperts can opine on industry custom and trade usage; but cannot opine on the legal effect of a document, the drafters' intent or other aspects of contract interpretation that belong squarely in the realm of law."); see also Krys v. Aaron, 112 F. Supp. 3d 181, 204 (D.N.J. 2015) ("Mr. Vinella's testimony likewise will be excluded to the extent he concludes that Defendants' conduct breached certain legal or contractual duties, because this testimony reaches beyond merely addressing an ultimate issue, and instead constitutes an inadmissible legal opinion.").

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. "If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." Paoli II, 35 F.3d at 748 (quoting In re Agent Orange Prod. Liab. Litig., 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985))

Thus, Somerlot's reliance on inadmissible evidence, such as hearsay, would not render his testimony per se inadmissible.  In any event, the question of the Deficiency Log's admissibility is not before the court.  See In re Tylenol (Acetaminophen) Mktg., Sales Pracs., & Prod. Liab. Litig., 198 F. Supp. 3d 446, 456 (E.D. Pa. 2016) ("Whether an expert can rely on case reports or whether a court can admit the case reports themselves into evidence are two entirely different questions.").

Furthermore, defendants do not assert that the information in the Deficiency Log is not the kind of facts technical experts in Somerlot's field would reasonably rely upon in rendering their opinions on the quality and delivery of shop drawings.  Rather, they argue that Somerlot has not established that "the objective adequacy of shop drawings . . . is measured by the quantum or nature of questions a fabricator has about their content," nor that "all of the concerns" identified in the emails "stemmed from actual problems with the shop drawings."  ECF No. 203 at 13–14.

However, it appears that Somerlot uses the Deficiency Log to explain the evidentiary bases for his opinions.[4]  See, e.g., ECF No. 188-8 at 15. ("It did not appear to Vidaris that the issues were clarified and resolved quickly based on the number of correspondences from January through end

---

[4] It is also worth noting that the Deficiency Log is only referenced in *one* of Somerlot's three reports.  See ECF No. 188-9.

of 2016."). Moreover, Somerlot testified that he did not exclusively rely on the Deficiency Log in forming his opinions; he also independently reviewed an "extensive amount of email documentation." ECF No. 191-13 at 11:22–24.[5] Finally, Somerlot explained that because "coordination is a common theme on these big, complicated projects," the issue of whether a request for information renders shop drawings "insufficient" or below industry standards is a highly context-dependent question.[6] Thus, contrary to defendants' assertions, the record sufficiently establishes the relevancy reasonableness of the Deficiency Log for purposes of Somerlot's analysis.

Therefore, the court finds that there are good grounds for Somerlot to have relied upon the Deficiency Log for purposes of evaluating the quality of the shop drawings and determining whether the shop drawings required "excessive" coordination between the parties. See Paoli II, 35 F.3d at 749 ("[W]hen a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert.").

Defendants' challenges to the sufficiency of the factual foundation underlying Somerlot's opinions go to the weight of his testimony, not its admissibility. As such, the conventional devices of the adversary process, such as cross-examination, are the appropriate means for addressing such challenges, not wholesale exclusion. See Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002) ("Rule 705, together with Rule 703, places the burden of exploring the facts

---

[5] See also id. at 11:25–12:7 ("Q: Okay. So you didn't just take their word for it? A: No. Q: And you didn't just say, hey, this looks like a long list, maybe I'll append it to my report? A: No . . . [t]hat's not what we do.").

[6] See ECF No. 188-9 at 15 (Somerlot Dep. at 56:16–19) ("And conversations relative to fabrication processes is different depending on the project and the level of conversation."); see also id. at 39 (Somerlot Dep. at 151:9–11) ("It depends on the extent and the quantity of issues like this, which in our review were substantial.").

and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination.").

Accordingly, Somerlot used sufficient facts in the record, including the shop drawings and communications between the parties, and applied his years of experience in the construction industry to reach his conclusions.  Therefore, his testimony satisfies the foundational requirements of admissibility under Rules 702 and 703.

### C.  Plaintiff's Motion to Exclude Dean Rutila

As referenced above, defendants proffer a rebuttal report authored by Dean Rutila ("Rutila") of Simpson Gumpertz & Heger Inc. ("SGH") in response to the Vidaris Report.  Rutila's report (the "SGH Report") concluded, *inter alia*, that: (1) the Vidaris Report incorrectly claimed that the quality of shop drawings provided to TAKTL did not meet industry standards; (2) TAKTL should have anticipated the number of unique panel sizes and parts that the Project would require; (3) many of Somerlot's claims are either unsupported or incompletely and inaccurately supported; and (4) TAKTL could have resolved any inconsistencies or omitted details in the shop drawings by consulting with IWR and AGT.  ECF No. 181-1 at 5.  TAKTL moves to exclude the SGH Report and Rutila's expert testimony in their entirety.  ECF No. 180.

TAKTL argues that Rutila's opinions are unreliable because he could not pinpoint the number of deficiencies that would have rendered the shop drawings below industry standards. ECF No. 181 at 11.  TAKTL further contends that Rutila's opinions are based on his subjective interpretation of select pieces of evidence.  Id. at 12–14.  Finally, TAKTL argues that Rutila impermissibly opines on TAKTL's state of mind when he concluded that TAKTL should have understood the complexity and scale of its task.  Id. at 15.

Defendants counter that Rutila performed the same analysis as Somerlot, only he reached a different conclusion.  ECF No. 194 at 19.  So, if Somerlot's opinions are admissible, defendants essentially assert that "the other side of the coin" must be presented to the jury as well.

TAKTL's objections to the reliability and scope of Rutila's expert testimony are without merit.  The court agrees with defendants that just like the other experts, Rutila used his knowledge and experience to assess the quality of the shop drawings and the claims in the Vidaris Report.  Most of plaintiff's objections leveled at Rutila have been discussed *infra* and the court will not readdress those issues here.  Because Rutila relied upon the same factual predicate and processes as the other experts, any objection against Rutila that merely recycles an argument raised against the other experts is rejected for the same reasons.  That said, the court will briefly address the sufficiency of Rutila's testimony under Rule 702 and the permissible scope of the same.

First, Rutila possesses the requisite knowledge and experience to qualify as an expert.  He is licensed professional engineer in Missouri with over forty years of experience designing and investigating building-envelope systems, including GFRC rainscreen cladding and curtain wall panel systems.  See ECF No. 181-1 at 7.  Rutila is also familiar with the standards for a design-assist construction project in St. Louis, Missouri, where the Barnes Jewish Hospital North Building and the St. Louis Children's Hospital Building are located.  Id.  Moreover, Rutia's testimony is reliable and fits the facts of the case.  Rutila reviewed the shop drawings, Vidaris Report, and other relevant documents, including, *inter alia*, the subcontractor agreements, architectural drawings, requests for information, change orders, and various exhibits attached to the Vidaris Report.  See id. at 9–11.

By applying his knowledge and experience in his evaluation of the foregoing materials, Rutila determined that many of the deficiencies identified by Somerlot in the Vidaris Report were either immaterial or not, in actuality, an error or omission.  As stated above, Rutila's conclusions

are derived from the same methodology and materials that Nasser, Kercsmar, and Somerlot utilized. Thus, his opinions satisfy the foundational requirements for admissibility under Rule 702.

Once again, TAKTL's arguments regarding the reliability of Rutila's testimony challenge the factual foundation of his opinions and the conclusions he reached in the SGH Report. Such arguments go to the weight of his testimony, not to its admissibility. See Walker, 46 F. App'x at 695–96.

Further, contrary to TAKTL's assertion, Rutila does not impermissibly opine on TAKTL's state of mind. While experts are not "permitted to testify regarding the intent, motive, or state of mind, or evidence by which such state of mind may be inferred," Rutila's conclusions do not exceed these bounds. AstraZeneca LP v. Tap Pharm. Prod., Inc., 444 F. Supp. 2d 278, 293 (D. Del. 2006) (cleaned up). Such "state of mind" testimony is prohibited because it offers inappropriate legal conclusions and invades the province of the jury. See In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prod. Liab. Litig., 181 F. Supp. 3d 278, 294 (E.D. Pa. 2016) ("Expert testimony, which draws a legal conclusion about corporate state of mind, is not admissible."); see also id. at n.27 (collecting cases holding the same).

Here, Rutila concludes that TAKTL should have been able to discern that it needed to produce a significant number of parts and unique panels based on the information it received before the Purchase Orders were executed. ECF No. 181-1 at 27. Notably, this conclusion directly responds to Somerlot's claim that the "number of non-standard panel sizes" was "surprising" and "alarming" because the architectural drawings did "not suggest atypical sizes for every floor." ECF No. 188-6 at 7.

Rutila explains that because the Project used "fast-track" and "design-assist" procedures to save time and money, the architectural drawings were less specific and required greater

coordination than "traditional design-bid-build projects." ECF No. 181-1 at 27. Rutila further interprets the architectural and mock-up shop drawings to demonstrate that TAKTL received extensive information regarding the Project beforehand. Id. at 28. Rutila concludes that TAKTL should have understood the nature and scope of its work based on this information and the Project's design-assist approach.

The above conclusion does not offer an opinion about TAKTL's intent or whether it breached its legal duties, nor does it offer testimony about documents which the jury themselves can easily interpret on their own. See In re: Tylenol (Acetaminophen) Mktg., Sales Pracs., & Prod. Liab. Litig., No. 2:12-CV-07263, 2016 WL 4039271, at *8 (E.D. Pa. July 28, 2016). Rather, Rutila offers an opinion, derived from industry customs and technical documents, concerning what TAKTL knew or should have known prior to finalizing the Purchase Orders. This testimony will assist the jury in understanding the evidence as it relates to the Purchase Orders and TAKTL's shop drawing claims. See Freedom Mortg. Corp., 2023 WL 2570201, at *17 ("Bryar's testimony, then, is helpful insofar as he clarifies how industry participants would have understood Freedom's actions and instructions, and how LoanCare could have been misled thereby."). And "testimony by a qualified expert concerning what *should* have occurred or been known rests squarely within the province of an expert." Krys v. Aaron, 112 F. Supp. 3d 181, 203 (D.N.J. 2015).

Accordingly, having found that Rutila's opinions meet the foundational requirements for admission under Rule 702, plaintiff's motion will be denied without prejudice.

## II.  Conclusion

Based on the foregoing, plaintiff's motion to exclude the testimony of David Nasser and Christopher Kercsmar will be denied; defendants' motion to exclude the expert testimony of Jeffrey Somerlot will be denied; and plaintiff's motion to exclude the expert testimony of Dean Rutila will be denied. An appropriate order follows.

Date: September 30, 2024

                                              s/David Stewart Cercone
                                              David Stewart Cercone
                                              Senior United States District Judge


cc:    Brian P. Maloney, Esquire
       Chad Allen Wissinger, Esquire
       Julie A. Mueller, Esquire
       Connor P. Sease, Esquire
       Jayme L. Butcher, Esquire
       Wellford H. Winstead, Esquire
       Brandon A. Levey, Esquire
       Mark A. Packman, Esquire
       Michael Rush, Esquire
       Shawna J. English, Esquire

       (*Via CM/ECF Electronic Mail*)