IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TAKTL, LLC** a limited liability company, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | 2:18cv1546 |
| | ) | **Electronic Filing** |
| **IWR, NORTH AMERICA, LLC** | ) | |
| a limited liability company formerly known | ) | |
| as IWR BUILDING SYSTEMS, LLC and | ) | |
| **ALLIANCE GLAZING** | ) | |
| **TECHNOLOGIES, INC.** | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | ) | |

## OPINION

TAKTL, LLC ("TAKTL" or "plaintiff") commenced this civil action against IWR North America, LLC ("IWR"), and Alliance Glazing Technologies, Inc. ("AGT") (collectively "defendants") for the breach of a commercial construction contract involving the manufacture of specialty concrete panels. Defendants asserted counterclaims for breach of contract and related damages. The parties have moved to exclude the testimony of several prospective expert witnesses pursuant to Daubert v. Dow Chemical, 509 U.S. 579 (1993). Presently before the court are plaintiff's motion to exclude the testimony of defendants' delay expert, Philip R. Urwin (ECF No. 174), and defendants' motion to exclude the testimony of plaintiff's delay expert, W. Michael Birmingham (ECF No. 185). For the reasons set forth below, plaintiff's motion will be denied, and defendants' motion will be granted in part and denied in part.

This action arises out of two contracts: one between IWR and TAKTL and one between AGT and TAKTL. Both contracts relate to construction projects at the Barnes Jewish Hospital North Building and the St. Louis Children's Hospital Building in St. Louis, Missouri (the "Project"). TAKTL supplied exterior enclosure panels for these buildings to AGT and IWR, two subcontractors for the Project. Generally, TAKTL has brought breach of contract claims against

AGT and IWR for failure to pay for the panels. AGT and IWR have asserted counterclaims for failure to manufacture the panels timely and accurately according to the Project's specifications and to deliver them sequentially in accordance with the contractually required schedule.

AGT executed Purchase Order No. 15-1754 with TAKTL on or about March 20, 2015 ("AGT Purchase Order"). IWR executed Purchase Order No. 2254 with TAKTL on or about August 26, 2015 ("IWR Purchase Order"). The terms of both Purchase Orders required TAKTL to produce certain quantities of pre-fabricated glass fiber reinforced concrete panels and to deliver those panels for assembly in accordance with the Project's schedule in exchange for payment.

The Project required panels of various configurations, sizes, and colors that needed to be installed in a particular sequence. As such, the manufacture, assembly, and installation processes needed to be specified and coordinated from the outset to minimize the risk of errors and delays. To do so, "shop drawings" of the panels were to be created. For each component of a structure, construction projects use shop drawings to communicate an actionable roadmap to the various parties involved in the manufacture-to-installation chain. In this case, the shop drawings for the panels were to depict the dimensional, design, and anchor details necessary for fabrication and installment. These drawings would then be converted into "fabrication tickets" that would enable TAKTL's personnel and machinery to manufacture the panels.

Under the terms of the AGT Purchase Order, fabrication tickets would be furnished directly to TAKTL. ECF No. 146 ¶ 23. As for IWR, it subcontracted with Wheaton & Sprague Engineering, Inc. ("Wheaton") to produce the shop drawings for its panels, from which TAKTL was responsible for creating its own fabrication tickets. Id. ¶ 24. TAKTL received multiple sets of shop drawings throughout the course of the Project, often in varying formats and for different purposes. ECF No. 193 at 7.

Defendants contend that TAKTL breached its contractual obligations by delivering late, incorrect, and out-of-sequence panels, which delayed and disrupted the entire Project. ECF No. 193 at 8. And TAKTL alleges that defendants provided untimely, deficient, and inaccurate shop drawings in a piecemeal fashion that made it impossible to manufacture the panels in an efficient and timely manner. ECF No. 175 at 5. Thus, one of the principal issues is the extent to which any timeliness, manner, and sequencing issues during the panels' manufacture-to-installation process can be attributed to the respective parties.

### A. Plaintiff's Motion to Exclude Philip Urwin

Defendants engaged Philip Urwin ("Urwin") at the Berkeley Research Group ("BRG") to provide expert testimony related to the Project's delay, disruption, and construction management. ECF No. 175-1 at 8. After conducting an extensive document review, Urwin offered his opinions in a report (the "BRG Report") and provided deposition testimony regarding the same. Urwin concluded that TAKTL was the cause of an extensive delay in connection with the Project. TAKTL moves to exclude Urwin's expert opinions as failing to comply with Federal Rule of Evidence 702 and the requirements of Daubert.

TAKTL asserts that Urwin's expert testimony must be excluded because it is unreliable and insufficiently tied to the facts of the case. Under Federal Rule of Evidence 702, trial courts must act as "gatekeeper" and exercise discretion to preclude expert testimony that is unreliable, irrelevant, or unhelpful to the jury. Daubert v. Merrell Dow Pharms., 509 U.S. 579, 597 (1993). In the Third Circuit, district courts must focus on the "trilogy of restrictions on expert testimony: qualification, reliability and fit." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316 (3d Cir. 2003). Thus, district courts should permit expert testimony so long as: (1) the expert has the necessary qualifications, (2) the testimony is based on reliable methods, and (3) the testimony

3

would assist the trier of fact in understanding the evidence or in resolving factual issues.  See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741–43 (3d Cir. 1994) ("Paoli II").[1]

With respect to reliability, TAKTL argues that Urwin's "disruption" analysis of IWR's performance is based upon an assumption that is not sufficiently grounded in sound methodology and reasoning.  ECF No. 179 at 13–14.  And as for "fit," TAKTL asserts that Urwin relied on facts that are not only unsupported by the record, but also contradicted by defendants' other experts in this matter.  Id. at 9–12.

Defendants counter that TAKTL mischaracterizes Urwin's opinions, the scope of his analysis, and the bases underlying his methodology.  As a result, defendants assert that TAKTL does not actually challenge the admissibility of Urwin's testimony, but the underlying facts and assumptions.  They further argue that Urwin sufficiently demonstrated the reliability and fit of his opinions based on his practical experience, specialized knowledge, and in-depth examination of the Project's records.

TAKTL's objections to the reliability and fit of Urwin's expert testimony are unavailing.  For the reasons below, the court finds that Urwin's opinions meet the foundational requirements for admission under Rule 702 and that TAKTL's challenges are best reserved for cross-examination at trial.

At the outset, Urwin possesses the requisite qualifications.  To qualify as an expert, the witness must possess specialized expertise, gained from "practical experience as well as academic training and credentials" in the relevant area.  Jones v. Swepi L.P., 643 F. Supp. 3d 547, 561 (W.D.

---

[1] This opinion applies the current version of Rule 702, which was most recently amended on December 1, 2023.  "The amendment does not substantively alter Rule 702, but rather 'clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard.'"  S.Y. v. Roman Cath. Diocese of Paterson, No. 20CV2605 (EP) (CLW), 2024 WL 1231333, at *2 (D.N.J. Mar. 21, 2024) (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendments).

4

Pa. 2022) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).  Although Urwin's qualifications are not contested, they bear upon TAKTL's challenges to the reliability and fit of his testimony.  Grasinger v. Caterpillar, Inc., No. CV 21-956, 2023 WL 4846843, at *9 (W.D. Pa. July 28, 2023).

Urwin has a bachelor's degree in construction management and a post graduate diploma in construction law and arbitration.  ECF No. 193-1 at 2.  He is a certified Project Scheduling Professional ("PSP") with twenty-five years of experience in construction management—over a decade of which was spent in the field.  ECF No. 175-1 at 8.  Urwin has given lectures and authored several publications on subjects related to construction management and dispute resolution.  Id.  He advises clients regularly on, *inter alia*, delay and disruption, and he has provided expert testimony in state court proceedings across the country.  ECF No. 193-1 at 10.  Thus, Urwin has gained specialized expertise in construction management and project scheduling from his education, licensing, and years of experience.  Thus, he is qualified under Rule 702 to render opinions regarding the Project's delay, disruption, and management.

Next, Urwin's testimony is reliable.  The reliability inquiry is a flexible one wherein the court must focus solely on the expert's chosen principles and methodology rather than the conclusions drawn therefrom.  Daubert, 509 U.S. at 594–95.  "To be reliable, the expert's opinion must be premised on more than mere subjective belief or unsupported speculation; the expert must have good grounds for his or her belief."  Marcum v. Columbia Gas Transmission, LLC, 549 F. Supp. 3d 408, 416 (E.D. Pa. 2021) (quoting Paoli II, 35 F.3d at 742) (internal quotation marks omitted).

Whether "good grounds" support an expert's potential testimony depends on various factors, including: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and

5

maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." Jones, 643 F. Supp. 3d at 562 (quoting Pineda v. Ford Motor Co., 520 F.3d 237, 247–48 (3d Cir. 2008)). But these factors are not exhaustive and some may be more or less applicable depending on the case. See Pineda, 520 F.3d at 248. Trial courts have broad latitude in determining whether these specific factors are "reasonable measures of reliability in a particular case." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999).

Here, TAKTL concentrates on a specific sentence within the approximately sixty pages of the BRG Report. To analyze the "disruption" to IWR's performance, Urwin compared the material TAKTL shipped over time with IWR's construction sequence and the Project's schedule. Urwin stated that this "analysis is based on IWR commencing installation when 90% of an installation group had been received." ECF No. 175-1 ¶ 65. TAKTL asserts that Urwin could not explain why he based his analysis on this 90% figure, which purportedly means it is an "assumption" that is "based on nothing more than intuition." ECF No. 175 at 13. Because "there is nothing to submit to peer review" and "it is impossible to ascertain any rate of error," TAKTL argues that Urwin's opinions regarding IWR's performance "should be excluded (along with his other opinions) as unreliable." Id. at 14.

TAKTL's argument, however, omits key details from the BRG Report and relies upon a misinterpretation of the law. Beginning with the former: TAKTL fails to mention, let alone address, the paragraph immediately following this alleged "assumption," where Urwin explains that "[t]he 90% figure is based on IWR's actual mitigation strategy which was to install flat panels on installation groups where it was possible to do so, even though the bonded corners for those

elevations were not yet available." ECF No. 175-1 ¶ 66.  Urwin further explained that he relied upon his experience, knowledge, and discussions with individuals at IWR regarding, *inter alia*, IWR's installation approach "in the field."  ECF No. 193-8 at 6 (Urwin Dep. 166:5–9).

Clearly, contrary to plaintiff's assertion, Urwin *could* set forth his rationale for this figure.  Moreover, in doing so, he demonstrated "good grounds" for his methodology.  Because when "the reliability of testimony from a practical expert depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it," courts have generally found that the "traditional" Daubert factors, such as peer review and potential error rate, are "simply are not appliable."  Jones, 643 F. Supp. 3d at 562 (quoting Elgert v. Siemens Indus., Inc., No. CV 17-1985, 2019 WL 1294819, at *5–6 (E.D. Pa. Mar. 20, 2019)).  Stated differently, "when an expert's practical experience guides the relevant opinion," as is the case with Urwin, "it is not dispositive that [he] does not meet the traditional indicators of reliability."  Jones, 643 F. Supp. 3d at 562.

As outlined above, Urwin's opinions and testimony are based on his considerable practical experience as a certified PSP.  In addition, Urwin reviewed various records, including, *inter alia*, the Purchase Orders, subcontract documents, drawings and specifications, delivery records, meeting minutes, correspondence, cost data, payment applications, Project schedules, and photographs.  ECF No. 175-1 ¶ 6.  Hence, Urwin's opinions are also based on an extensive review of the record and the facts established in this case.

In this context, he can reliably explain the "disruption impact" of any delayed or disorganized shipments in a way that uses his specialized knowledge to assist the trier of fact.  While TAKTL may have identified an alleged shortcoming in Urwin's conclusions, the Daubert inquiry is not focused on whether an expert's conclusions are correct, but whether they are reliable.  See Paoli II, 35 F.3d at 744.  Since there are good grounds for Urwin's opinions,  TAKTL can explore any deficiencies in the "facts and assumptions" underlying his testimony "through

effective cross-examination." Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002). Accordingly, the court finds that Urwin's opinions are sufficiently premised on his knowledge, experience, and facts in the record to satisfy the reliability prong.

Finally, Urwin's testimony fits because there are good grounds to believe it would help the jury decide a factual dispute. To determine whether an expert's testimony "fits" the proceedings, the trial court asks "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." United States v. Schiff, 602 F.3d 152, 173 (3d Cir. 2010) (quoting Daubert, 509 U.S. at 591). This requirement goes primarily to relevance. See Daubert, 509 U.S. at 591. Even if an expert's testimony is based on their specialized knowledge, "the testimony will be excluded if it is not knowledge related to the purposes of, or pertinent inquiry to, the case." Jones, 643 F. Supp. 3d at 563.

Here, defendants claim that TAKTL breached its contractual obligations by delivering late, incorrect, and out-of-sequence panels. Urwin's proffered testimony addresses the extent to which any timeliness, accuracy, and sequencing issues with the panels' delivery and installation delayed and disrupted defendants' overall performance. Thus, his testimony will assist the jury in understanding the evidence as it relates to defendants' counterclaims and theory of the case.

Nonetheless, TAKTL argues that the testimony of defendants' shop drawing experts, David Nasser and Christopher Kercsmar, contradicts the information Urwin relied upon in his report. As part of his analysis, Urwin developed an "as-planned schedule" to use as a baseline to measure TAKTL's performance. ECF No. 175-1 ¶ 130. To establish "a reasonable point at which to measure the start of TAKTL's lead time," Urwin looked to the release of the approved shop drawings. Id. ¶ 72. As a result, the staring date for his "as-planned schedule" was December 23, 2015, when TAKTL received the "approved as noted" shop drawings (the "December Drawings"). Id. ¶ 130.

At the same time, defendants retained Nasser and Kercsmar to review the shop drawings for the glass reinforced concrete ("GFRC") handset panels developed by Wheaton. ECF No. 179-3 at 2.  Nasser and Kercsmar concluded that the sets of drawings IWR submitted to TAKTL on January 15, 2016 (the "January Drawings") were "high quality" and "sufficient for use in the detailing of fabrication drawings for the handset GFRC panels." Id. at 17.

Essentially, TAKTL contends that Urwin based his delay analysis on the assumption that the December Drawings were sufficient for TAKTL to begin manufacturing the panels. But when Nasser and Kercsmar assessed the quality of the shop drawings, they concluded that the January Drawings were sufficient. So, according to TAKTL, Nasser and Kercsmar contradicted the entire basis of Urwin's analysis, and as a result, his opinions do not fit the facts of the case. See ECF No. 175 at 9–12.

The logical gymnastics that TAKTL engages in to make this argument are obvious and unpersuasive. As defendants point out, Nasser and Kercsmar neither evaluated the December Drawings, nor offered an opinion on their quality. ECF No. 193 at 14. That is to say, Nasser and Kersmar did not, in fact, expressly disavow the start date of Urwin's as-planned schedule.

For Urwin, the release date of the December Drawings was merely "a reasonable point at which to measure the start of TAKTL's lead time." Id. ¶ 72. He clarified that this "milestone" concerns the point when TAKTL had "sufficient information to start [the] next stage in the process," rather than the completeness and accuracy of the information it received. ECF No. 193-8 at 3 (Urwin Dep. 46:17–18); see also id. at 4 (Urwin Dep. 49:19–20) ("It's when have you got the documents, the drawings, that allow you to proceed with the next step . . . [t]hat's what I'm referring to."). Because, as Urwin explained, in terms of construction schedules, "there is a difference between being able to start and being able to finish," and the construction industry operates on both. Id. (Urwin Dep. 52:13–16). Thus, it does not follow that by designating

9

December 23, 2015, as a "reasonable" lead time, Urwin offers an opinion—impliedly or otherwise—on the quality of the December Drawings. TAKTL's "argument on this point really amounts to nothing more than a complaint" that Urwin's hypothetical schedule "did not adopt [its] view of the case." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290 (3d Cir. 2012).

TAKTL argues that because Urwin used the release of the December Drawings as his start date, then he also needed to establish that they included the necessary information for TAKTL to manufacture the panels. ECF No. 175 at 11. But this position demands too much of Urwin's analysis. As long as there is a basis in the record, "an expert may rely on factual assumptions provided by a party in forming his or her opinion." Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc., No. CV 15-405, 2018 WL 7815202, at *9 (E.D. Pa. Dec. 13, 2018).

Not only is Urwin's start date consistent with defendants' theory of the case—that the contracts required TAKTL to begin manufacturing the panels once it received the December Drawings—it is also sufficiently supported by the factual record. See ECF No. 193 at 16. Indeed, the exhibits attached to the BRG Report include copies of the parties' communications on December 23, 2015 advising of the shop drawings' approval. See ECF No. 175-1 ¶ 105. And Urwin constructed the framework for his as-planned schedule based upon the schedules attached to the IWR Purchase Order which illustrated the intended sequence and duration for its scope of work. Id. ¶ 130. Hence, the factual assumptions underlying Urwin's as-built schedule—that receipt of the December Drawings was "a reasonable point" for TAKTL to *begin* manufacturing the panels in accordance with the Project's schedule—have a sufficient basis in the record.

Urwin does not purport to offer opinions on the quality of the shop drawings; rather, he is proffered as a delay and disruption expert whose opinions rest, in part, on an assumption regarding the December Drawings. Since there is some support for his assumption in the record, any questions as to the sufficiency of the factual basis underlying his opinions are left to the jury.

Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc., No. CV 15-405, 2018 WL 7815202, at *9 (E.D. Pa. Dec. 13, 2018) ("To the extent that there are any questions of the sufficiency of Molder's assumptions at trial, this is a question for the jury."). Accordingly, because there are good grounds to believe Urwin's testimony will help the jury decide a factual dispute, Daubert's fit requirement is satisfied.

Having established that Urwin is a qualified expert, his opinions are sufficiently reliable, and there are good grounds to believe that his testimony will be helpful to the jury, defendants have met the foundational requirements for admission under Rule 702. Accordingly, plaintiff's Daubert motion to exclude the report and testimony of Urwin will be denied.

**B. Defendants' Motion to Exclude Michael Birmingham**

TAKTL proffers a rebuttal report authored by Michael Birmingham ("Birmingham") of the Rhodes Group in response to the BRG Report. Birmingham's report (the "Rhodes Report") concluded, *inter alia*, that: (1) Urwin's entire delay and disruption analysis is based on the unsupported determination that TAKTL received complete and accurate shop drawings; (2) Urwin failed to consider records which reflect that the December Drawings were incomplete and subject to continuous updates and revisions throughout the following year; (3) Urwin's "as-planned schedule" reflected a compressed plan that was different from the staggered schedule in the parties' original agreements; and, (4) Urwin's "total time approach" for calculating delay failed to consider other sources of delay that were unrelated to TAKTL. ECF No. 186-2 at 4–5. Defendants move to exclude the Rhodes Report and Birmingham's expert testimony in their entirety. ECF No. 185.

Defendants challenge Birmingham's testimony under each requirement in the Rule 702 trilogy. For qualification, they argue that Birmingham inappropriately opines on the quality of the shop drawings and issues related to damages, which are opinions he is not qualified to offer. ECF No. 186 at 16–19. As for reliability, they contend that Birmingham relied upon selective

11

information provided by TAKTL without independently verifying it, and that he failed to include any data-based, verifiable analyses in the Rhodes Report. Id. at 13–16. Lastly, defendants argue that the third conclusion in the Rhodes Report—that Urwin's compressed, as-planned schedule failed to consider the parties' original, staggered plan—does not fit the facts of the case because TAKTL agreed to a modified schedule. Id. at 19–20.

In response, TAKTL asserts that Birmingham does not opine on the quality of the shop drawings, he simply highlights the lack of evidence for Urwin's assumption regarding the sufficiency of the December Drawings. ECF No. 190 at 13–14. TAKTL further argues that the reliability of Birmingham's opinions is derived from his knowledge, experience, and review of primary sources documents provided by TAKTL. Id. at 9–13. Finally, TAKTL counters that Birmingham's third conclusion fits because the issue of whether it agreed to a modified schedule is a key factual dispute, so it was permissible for him to rely on the version it intends to prove at trial. Id. at 15–16.

Apart from one unopposed objection, defendants' challenges are unavailing. For the reasons below, the court finds that Birmingham's opinions meet the foundational requirements for admission under Rule 702. However, because defendants' objection regarding Birmingham's opinion on damages is unopposed, their motion is granted to the extent it seeks to prohibit such testimony and related portions of the Rhodes Report.

First, Birmingham is qualified to evaluate Urwin's opinions on delay and disruption. He has a bachelor's degree in chemical engineering and approximately twenty years of experience consulting on construction-related claims. ECF No. 186-2 at 30–31. In addition to being a certified PSP, Birmingham is also a Certified Cost Professional ("CCP"). Id. at 31. And he specializes in, *inter alia*, critical path method ("CPM") scheduling, delay and disruption, and loss of productivity. Id. at 30. All told, this court finds that Birmingham's education, professional

12

licensing, and years of experience as a consultant sufficiently demonstrate his specialized expertise in construction delay and disruption. Therefore, he is qualified under Rule 702 to render an expert opinion on Urwin's delay and disruptions assessment.

However, defendants argue that Birmingham is not qualified to offer opinions on the quality of the shop drawings or issues related to damages. With respect to the latter, defendants challenge the following excerpt in the Rhodes Report wherein Birmingham discusses the opinions of defendants' damages expert, James V. Farrell (Farrell):

> The alleged damages asserted in Farrell's report are based on a flawed delay analysis that failed to consider the four (4) month delay to the start of GFRC panel installation due to issues unrelated to TAKTL. Similarly, the alleged damages fail to consider the ongoing shop drawing changes and other revisions discussed previously in this report, which extended TAKTL's production of the GFRC panels.

ECF No. 186-2 ¶ 73. Defendants emphasize that beyond stating that Birmingham was not designated as a damages expert, TAKTL does not address this point in its brief in opposition and, therefore, it should be considered waived. ECF No. 198 at 11–12. Similarly, at oral argument, defendants argued that because Birmingham was "not offered as an expert on damages," then "at the very least, the portion of his report that looks at [Farrell's] report" and takes "issue with those conclusions should be excluded." Daubert Hr'g Tr. 58:13–19. Counsel for TAKTL failed to address to this argument in its response. Id. at 59–63.

At each opportunity to address this point, TAKTL has remained silent. In effect, TAKTL does not oppose defendants' motion as it relates to Birmingham's opinion on Farrell's damages analysis. Thus, the motion will be granted as unopposed to the extent it seeks to prohibit Birmingham from testifying as to Farrell's opinions and the related portions of the Rhodes Report. See Wichterman v. City of Philadelphia, No. CV 16-5796, 2020 WL 7488645, at *5 (E.D. Pa. Dec. 21, 2020) (granting unopposed portions of Daubert motion).

13

As for the shop drawings, defendants argue that Birmingham's opinions "explicitly or implicitly flow" from a conclusion that he is not qualified to offer, *i.e.*, that the December Drawings were "incomplete" and "inaccurate." Because he has no experience creating or analyzing shop and fabrication drawings, defendants argue that any of his opinions which stem from this conclusion should be precluded.

Birmingham does not purport to offer opinions on the quality of the shop drawings; rather, he is proffered to rebut defendants' delay and disruption expert whose opinions rest, in part, on the assumption that the December Drawings were sufficient for TAKTL to begin manufacturing the panels. Birmingham relied upon the report of TAKTL's shop drawing expert (the "Vidaris Report") in arriving at the conclusion that the December Drawings were incomplete and inadequate. ECF No. 186-2 at 16. Upon evaluating the quality of the December Drawings, the Vidaris Report stated that "[n]o manufacturer would have been able to produce accurate fabrication drawings from this set of progress shop drawings without further coordination and clarification." Id. Since Birmingham is not a shop drawing expert, he is entitled to rely upon the Vidaris Report "as it is well-settled that one expert may rely upon another expert's opinion in formulating his own." Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 286 F.R.D. 266, 271 (W.D. Pa. 2012). Thus, while Birmingham's conclusions are premised upon another expert's opinion, they are appropriately limited to his own to area of expertise.

Turning to reliability, the court finds that Birmingham's testimony is sufficiently premised on good grounds. Like Urwin, Birmingham's opinions and testimony are based on his considerable practical experience as a construction consultant, a review of the record, and the facts established in this case. Thus, he can reliably use his specialized knowledge to evaluate Urwin's opinions regarding delay and disruption in a way that will assist the trier of fact.

Curiously, while defendants contend that Birmingham is not qualified to offer an opinion on the quality of the shop drawings, they simultaneously assert that his testimony is unreliable because he did not employ an objective method or procedure in reaching this conclusion. Stated differently, defendants argue that Birmingham needed to perform an analysis that he is not qualified to conduct. Moreover, to the extent the Rhodes Report asserts that the incomplete shop drawings required "excessive" coordination between the parties—and it does not—defendants make the same "there's-no-objective-standard" reliability argument. ECF No. 186 at 12–13. These assertions are unsupported by the record.

As a practical expert, the reliability of Birmingham's testimony "depends heavily on [his] knowledge and experience, rather than the methodology or theory behind it." Jones, 643 F. Supp. 3d at 562. As such, the absence of a testable methodology, peer review, or potential error rate is not dispositive because these "traditional" Daubert factors are "simply are not appliable." Id. Moreover, as discussed above, Birmingham does not offer an opinion on the quality of the shop drawings; he simply relied upon the Vidaris Report in reaching his conclusions. Nor does he opine on the amount of coordination between the parties. See ECF No. 186-3 at 15 (Birmingham Dep. 56:1–7) ("Q: What would I look at in the record in this case, or anywhere, to determine whether the volume of clarifications described in your report is a number that's too many? A: I wouldn't know . . . I wouldn't have an opinion on that.").

Defendants further argue that Birmingham's testimony is unreliable because he relied on information provided by TAKTL without independently verifying it. They contend that Birmingham derived too much of his information from "discussions with TAKTL," and that the materials he reviewed were "incomplete" because they were only "selective documents that TAKTL asked him to review." ECF No. 186 at 14.

15

Yet, defendants do not contest that Birmingham reviewed "dozens of sources documents" related to the Project and this litigation, including, *inter alia*, the Purchase Orders, material delivery logs, correspondence between the parties, shop drawings and notes added thereto, drawing logs, and schedule updates. ECF Nos. 190 at 12; 186-2 at 29. In other words, the defendants do not dispute that "the record contains *some* factual basis" for Birmingham's opinions. Stecyk, 295 F.3d at n.3 (3d Cir. 2002). Rather, defendants assert that the information he relied upon "is not enough." ECF No. 198 at 10. But whether Birmingham "should have considered more" is "an issue that goes . . . to the weight, rather than the admissibility" of his testimony. T.N. Incorporation, Ltd. v. Fid. Nat'l Info. Servs., Inc., No. CV 18-5552, 2021 WL 5980048, at *10 (E.D. Pa. Dec. 17, 2021); see also Marcum, 549 F. Supp. 3d at 418 (E.D. Pa. 2021) ("Whether Ingram should have done more research and performed more calculations is an appropriate issue for cross-examination at trial.").

Likewise, TAKTL's version of the disputed facts, such as those regarding its production process and the drawing issues it encountered, support Birmingham's conclusions. And "[a]n expert is permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." Walker v. Gordon, 46 F. App'x 691, 695–96 (3d Cir. 2002). Moreover, Birmingham "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. So, he "need not base his opinion on first-hand knowledge, and in fact can rely on observations made by others as well as [his or her] own expertise." Corner Pocket, Inc. v. Travelers Ins., No. CIV.A. 12-288, 2013 WL 3993967, at *6 (W.D. Pa. Aug. 5, 2013).

Therefore, Birmingham may rely on TAKTL's version of the disputed facts—whether he derives them from discussions or otherwise—in formulating his opinions. See Orbital Eng'g, Inc. v. Buchko, 578 F. Supp. 3d 727, 734 (W.D. Pa. 2022) ("Dr. Thaw may properly base his

conclusions on his discussions with Buchko."). While defendants "may raise valid arguments" about Birmingham's reliance on TAKTL for certain conclusions or "other instances in which he did not perform independent verifications," his "testimony need not be without flaw, based on the best methodology, or even come to the right conclusions as long as there are still good grounds to hold those opinions." Warren Hill, LLC v. Neptune Invs., LLC, No. CV 20-452, 2021 WL 2044389, at *7 (E.D. Pa. May 20, 2021). Defendants are "welcome to conduct 'vigorous cross-examination' and present contrary evidence and testimony to dispute any flaws" they see in Birmingham's opinion at trial. Id. (quoting Daubert, 509 U.S. at 596). But because Birmingham's opinions are sufficiently premised on his knowledge, experience, and facts in the record to satisfy the reliability prong, "[t]hese conventional devices, rather than wholesale exclusion . . . are the appropriate safeguards." Daubert, 509 U.S. at 596.

Finally, Birmingham's proposed testimony fits because it addresses the extent to which any problems with the timeliness and manner of manufacturing, delivering, and installing the panels can be attributed to TAKTL. These are central issues in the breach of contract claims and counterclaims in this case. Thus, his testimony will assist the jury in understanding the evidence as it relates to plaintiff's theory of the delay and disruption that occurred during the course of the Project.

Defendants' objection to the fit of Birmingham's opinions surrounds his third conclusion—that Urwin's "as-planned schedule" reflected a compressed plan that was different from the staggered schedule in the parties' original agreements. Defendants contend that this opinion is irrelevant because TAKTL agreed to a modified schedule. ECF No. 186 at 19. Because Birmingham supposedly failed to consider "what the parties . . . actually agreed to," defendants argue that this opinion is insufficiently tied to the facts of this case. Id. at 20.

Once again, defendants' argument is without merit. First, Birmingham's third conclusion does not rely on "an outdated schedule," rather it contends that Urwin's compressed schedule "failed to consider the impact of the unanticipated overlap between the AGT and IWR scopes of work." ECF No. 186-2 ¶ 63; see also id. ¶ 32(c) ("BRG failed to consider the impacts on TAKTL's work related to the elimination of the staggered start between AGT and IWR Panels in BRG's time-adjusted plan.").

Second, based on TAKTL's brief in opposition, whether it "agreed to a modified schedule" is not an agreed-upon fact, but rather a key dispute that the factfinder will decide at trial. ECF No. 190 at 15. Since Birmingham may base his opinions "on a particular version of disputed facts," Walker, 46 F. App'x at 695–96, he is well within his purview to rely upon TAKTL's account of the schedule and the impact of any changes thereto. See ECF No. 190 at 15–16 ("TAKTL will show at trial that the delivery schedule demanded by Defendants was a compressed schedule compared to the original panel shipment schedule as agreed upon in the applicable contracts."). Accordingly, the court finds that Birmingham's opinion testimony satisfies Daubert's fit requirement because there are good grounds to believe it would help the jury decide a factual dispute.

Having established that Birmingham is a qualified expert, his opinions are sufficiently reliable, and there are good grounds to believe that his testimony would be helpful to the jury, plaintiff has met the foundational requirements for admission under Rule 702. The court will, however, limit his testimony as described above. In all other respects, defendants' Daubert motion will be denied.

### C. Conclusion

Based on the foregoing, plaintiff's motion seeking to preclude the expert testimony of Philip R. Urwin [174] will be denied. Defendants' motion to exclude the expert testimony of W. Michael

Birmingham [185] will be granted in part and denied in part. The motion will be granted to the extent it seeks to prohibit Birmingham from testifying as to Farrell's opinions and the related portions of the Rhodes Report. The motion will be denied in all other aspects. An appropriate order will follow.

Date: September 30, 2024

s/David Stewart Cercone  
David Stewart Cercone  
Senior United States District Judge

cc: Brian P. Maloney, Esquire  
    Chad Allen Wissinger, Esquire  
    Julie A. Mueller, Esquire  
    Connor P. Sease, Esquire  
    Jayme L. Butcher, Esquire  
    Wellford H. Winstead, Esquire  
    Brandon A. Levey, Esquire  
    Mark A. Packman, Esquire  
    Michael Rush, Esquire  
    Shawna J. English, Esquire

    (*Via CM/ECF Electronic Mail*)