**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TAKTL, LLC** a limited liability company, )<br>    )<br>  Plaintiff/Counterclaim Defendant,  )<br>    )<br>      v.     )<br>    )<br>**IWR, NORTH AMERICA, LLC**  )<br>a limited liability company formerly known )<br>as IWR BUILDING SYSTEMS, LLC and  )<br>**ALLIANCE GLAZING**  )<br>**TECHNOLOGIES, INC.**  )<br>    )<br>  Defendants/Counterclaim Plaintiffs.  ) | 2:18cv1546<br>**Electronic Filing** |

## OPINION

TAKTL, LLC ("TAKTL" or "plaintiff") commenced this civil action against IWR North America, LLC ("IWR"), and Alliance Glazing Technologies, Inc. ("AGT") (collectively "defendants") for the breach of a commercial construction contract involving the manufacture of specialty concrete panels. Defendants asserted counterclaims for breach of contract and related damages. The parties have moved to exclude the testimony of several prospective expert witnesses pursuant to Daubert v. Dow Chemical, 509 U.S. 579 (1993). Presently before the court are plaintiff's motion to exclude the testimony and report of defendants' damages expert, James V. Farrell (ECF No. 176), and defendants' motion to exclude the testimony and report of plaintiff's damages experts, Mark M. Gleason and Gregory Landgraf (ECF No. 183). For the reasons set forth below, plaintiff's motion will be granted in part and denied in part, and defendants' motion will be denied.

This action arises out of two contracts: one between IWR and TAKTL and one between AGT and TAKTL. Both contracts relate to construction projects at the Barnes Jewish Hospital North Building and the St. Louis Children's Hospital Building in St. Louis, Missouri (the "Project"). TAKTL supplied exterior enclosure panels for these buildings to AGT and IWR, two

subcontractors for the Project.  Generally, TAKTL has brought breach of contract claims against AGT and IWR for failure to pay for the panels.  AGT and IWR have asserted counterclaims for failure to manufacture the panels timely and accurately according to the Project's specifications and to deliver them sequentially in accordance with the contractually required schedule.

AGT executed Purchase Order No. 15-1754 with TAKTL on or about March 20, 2015 ("AGT Purchase Order").  IWR executed Purchase Order No. 2254 with TAKTL on or about August 26, 2015 ("IWR Purchase Order").  The terms of both Purchase Orders required TAKTL to produce certain quantities of pre-fabricated glass fiber reinforced concrete panels and to deliver those panels for assembly in accordance with the Project's schedule in exchange for payment.

The Project required panels of various configurations, sizes, and colors that needed to be installed in a particular sequence.  As such, the manufacture, assembly, and installation processes needed to be specified and coordinated from the outset to minimize the risk of errors and delays. To do so, "shop drawings" of the panels were to be created.  For each component of a structure, construction projects use shop drawings to communicate an actionable roadmap to the various parties involved in the manufacture-to-installation chain.  In this case, the shop drawings for the panels were to depict the dimensional, design, and anchor details necessary for fabrication and installment.  These drawings would then be converted into "fabrication tickets" that would enable TAKTL's personnel and machinery to manufacture the panels.

Under the terms of the AGT Purchase Order, fabrication tickets would be furnished directly to TAKTL.  ECF No. 146 ¶ 23.  As for IWR, it subcontracted with Wheaton & Sprague Engineering, Inc. ("Wheaton") to produce the shop drawings for its panels, from which TAKTL was responsible for creating its own fabrication tickets.  Id. ¶ 24.  TAKTL received multiple sets of shop drawings throughout the course of the Project, often in varying formats and for different purposes.  ECF No. 193 at 7.

Defendants contend that TAKTL breached its contractual obligations by delivering late, incorrect, and out-of-sequence panels, which delayed and disrupted the entire Project.  ECF No. 193 at 8.  And TAKTL alleges that defendants provided untimely, deficient, and inaccurate shop drawings in a piecemeal fashion that made it impossible to manufacture the panels in an efficient and timely manner.  ECF No. 175 at 5.  Thus, one of the principal issues is the amount of damages each party incurred as a result of their respective allegations.

TAKTL engaged Mark Gleason ("Gleason") and Gregory Landgraf ("Landgraf") at Gleason & Associates, P.C., to provide expert testimony regarding "the amount of damages experienced by TAKTL as a result of the Defendants alleged actions."  ECF No. 184-1 ¶ 17. Gleason and Landgraf issued their opinions in an expert report on December 7, 2020 (the "December Report").  Id. at 2.  IWR engaged James Farrell ("Farrell") at the Berkeley Research Group ("BRG") to: (1) determine the amount of damages that IWR suffered because of TAKTL's alleged "failure to perform," and (2) to "read, evaluate, and analyze" the December Report and provide his opinions regarding the same.  ECF No. 177-1 ¶ 26.  Farrell offered his affirmative and rebuttal opinions on the foregoing in an expert report on January 26, 2021 (the "Farrell Report"). Gleason and Landgraf authored a rebuttal report in response to the Farrell Report in February of 2021 (the "February Report").  ECF No. 184-2.

**A.  Plaintiff's Motion to Exclude James V. Farrell**

Farrell concluded that the total of IWR's damages is $9,366,193 and that the December Report overstated TAKTL's damages by at least $2,502,239.  ECF No. 177-1 ¶¶ 28, 30.  TAKTL moves to exclude Farrell's expert report and proffered testimony as failing to comply with Federal Rule of Evidence 702 and the requirements of Daubert.

TAKTL asserts that Farrell's expert testimony must be excluded because it is unreliable and insufficiently tied to the facts of the case.  Under Federal Rule of Evidence 702, trial courts

must act as "gatekeeper" and exercise discretion to preclude expert testimony that is unreliable, irrelevant, or unhelpful to the jury.  <u>Daubert v. Merrell Dow Pharms.</u>, 509 U.S. 579, 597 (1993). In the Third Circuit, district courts must focus on the "trilogy of restrictions on expert testimony: qualification, reliability and fit."  <u>Calhoun v. Yamaha Motor Corp., U.S.A.</u>, 350 F.3d 316 (3d Cir. 2003).  Thus, district courts should permit expert testimony so long as: (1) the expert has the necessary qualifications, (2) the testimony is based on reliable methods, and (3) the testimony would assist the trier of fact in understanding the evidence or in resolving factual issues.  <u>See</u> <u>In re Paoli R.R. Yard PCB Litigation</u>, 35 F.3d 717, 741–43 (3d Cir. 1994) ("<u>Paoli II</u>").[1]

TAKTL argues that Farrell's opinions are unreliable because he failed to: (1) independently verify information provided to him by IWR, and (2) consider "any" relevant variables that could impact his conclusions.  ECF No. 177 at 15.  And as for "fit," TAKTL asserts that Farrell relied on facts that are not only unsupported by the record, but also contradicted by the opinions of defendants' other experts in this matter.  <u>Id.</u> at 10–13.  Finally, TAKTL contends that to the extent Farrell intends to opine on the parties' legal duties and the elements of their claims, such opinions are improper legal conclusions.  <u>Id.</u> 13–14.

Defendants counter that TAKTL's challenges to facts and assumptions underlying Farrell's opinions go to the weight of his testimony, not its admissibility.  ECF No. 192 at 16–19.  They assert that TAKTL mischaracterizes the scope and conclusions of the other expert witnesses' opinions and Farrell's reliance thereon.  <u>Id.</u> at 9–15.  Lastly, defendants maintain that by opining

---

[1] This opinion applies the current version of Rule 702, which was most recently amended on December 1, 2023.  "The amendment does not substantively alter Rule 702, but rather 'clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000— requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard.'"  <u>S.Y. v. Roman Cath. Diocese of Paterson</u>, No. 20CV2605 (EP) (CLW), 2024 WL 1231333, at *2 (D.N.J. Mar. 21, 2024) (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendments).

on the sufficiency of the calculations in the December Report, Farrell is well with his purview as an expert witness and not offering an improper legal conclusion.  Id. at 15–16.

TAKTL's objections to the reliability and fit of Farrell's expert report and testimony are unavailing.  Farrell's opinions meet the foundational requirements for admission under Rule 702.  Nevertheless, some of his rebuttal opinions exceed the permissible bounds of expert testimony.  Accordingly, the court will preclude such testimony and the related portions of his expert report as impermissible legal conclusions.  In all other respects, TAKTL's motion will be denied.  The court's rationale follows.

At the outset, Farrell possesses the requisite qualifications.  To qualify as an expert, the witness must possess specialized expertise, gained from "practical experience as well as academic training and credentials" in the relevant area.  Jones v. Swepi L.P., 643 F. Supp. 3d 547, 561 (W.D. Pa. 2022) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).  Although Farrell's qualifications are not contested, they bear upon TAKTL's challenges to the reliability and fit of his testimony.  Grasinger v. Caterpillar, Inc., No. CV 21-956, 2023 WL 4846843, at *9 (W.D. Pa. July 28, 2023).

Farrell is a Certified Public Accountant ("CPA") and a member of the American Institute of Certified Public Accountants and the Illinois CPA Society.  ECF No. 177-1 ¶ 7.  He also earned an MBA in economics from the University of Chicago.  Id.  Farrell is a director at BRG, which is "an international multi-disciplinary professional services firm, with practices in economics, restructuring, forensic accounting, and valuation."  Id. ¶ 6.  He has over thirty years of experience consulting clients with complex economic, financial, valuation, business, and litigation needs.  ECF No. 192-1 at 2.  Prior to joining BRG, he gained experience in construction claims, project and contract management, and project controls.  Id.

Farrell also serves as an expert witness on complex damage and other financial and accounting matters.  ECF No. 177-1 ¶ 8.  He has testified in federal and state courts throughout the United States, including in other construction disputes regarding, *inter alia*, the damages incurred from the delay, disruption, and changing conditions of projects.  Id. ¶¶ 9–10.  Farrell has gained specialized expertise in construction damages from his education, professional licensing and memberships, and years of experience.  Thus, he is qualified under Rule 702 to render opinions regarding IWR's damages and the December Report.

Next, Farrell's testimony is reliable.  The reliability inquiry is a flexible one wherein the court must focus solely on the expert's chosen principles and methodology rather than the conclusions drawn therefrom.  Daubert, 509 U.S. at 594–95.  "To be reliable, the expert's opinion must be premised on more than mere subjective belief or unsupported speculation; the expert must have good grounds for his or her belief."  Marcum v. Columbia Gas Transmission, LLC, 549 F. Supp. 3d 408, 416 (E.D. Pa. 2021) (quoting Paoli II, 35 F.3d at 742) (internal quotation marks omitted).

Whether "good grounds" support an expert's potential testimony depends on various factors, including: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." Jones, 643 F. Supp. 3d at 562 (quoting Pineda v. Ford Motor Co., 520 F.3d 237, 247–48 (3d Cir. 2008)).  But these factors are not exhaustive and some may be more or less applicable depending on the case.  See Pineda, 520 F.3d at 248.  Trial courts have broad latitude in determining whether these specific factors are

"reasonable measures of reliability in a particular case." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999).

Here, TAKTL argues that Farrell's opinions are unreliable because he failed to consider defendants' bid estimate and the money IWR received from other sources, such as from the owner of the Project, in his calculations. ECF No. 177 at 15. Stated differently, by failing to consider "any baseline" from which additional costs may be measured, Farrell, in effect, assertedly calculated IWR's costs rather than its damages. Id. Similarly, TAKTL argues that Farrell failed to consider IWR's historic profit and loss margins and overall profit or loss for the Project, so his calculations for damages that are "closely associated with profit margins . . . may include duplicative claims." Id. at 16. And by assuming TAKTL was "liable for any and all alleged damages IWR incurred," Farrell purportedly failed to consider "any relevant variables that could affect his conclusions." Id. at 18. Finally, TAKTL asserts that Farrell's analysis is unreliable because "he relied solely on [IWR]'s representations" and did not independently verify the data IWR provided to him for his calculations. Id. at 16.

TAKTL's challenges to the data and assumptions underlying Farrell's calculations fail to set forth a persuasive basis to exclude his expert testimony as unreliable. In addition to records regarding IWR's costs and finances, Farrell reviewed various documents related to this litigation and conducted interviews of the IWR executive team. ECF No. 177-1 ¶ 12. Moreover, following discussions with IWR personnel regarding the type of reports that its system could generate, Farrell received various documents from its accounting systems "as backup to [his] report," including financial statements and job cost reports. ECF No. 192-2 at 7 (Farrell Dep. 22:1–8). Farrell also relied upon his years of professional experience, as well as his prior work providing expert testimony on damages in construction disputes. ECF No. 177-1 ¶ 12. Accordingly, his opinions

are sufficiently premised on his knowledge, experience, and facts in the record to satisfy the reliability prong.

Moreover, the Daubert inquiry is not focused on whether an expert's conclusions are correct, but whether they are reliable.  See Paoli II, 35 F.3d at 744.  Farrell provided explanations as to why he did not consider IWR's bid estimate, overall profit or loss, or historic profit and loss margins.  With respect to the absence of a "baseline" figure in Farrell's calculations, he explained that he used the cost codes IWR created to track the additional costs it incurred correcting or resolving the issues it encountered "because of TAKTL."  ECF No. 192-2 at 8 (Farrell Dep. 26:23–27:6).  As such, he did not need to establish a "baseline" because his calculations are separate from the amount in IWR's bid estimate or the total payment it received for the Project; they are simply based upon the additional costs it incurred as a result of TAKTL's performance.  See id. (Farrell Dep. 28:12–17) ("They could make $10 million, but . . . they should have made $19 million. And so that's what we're asking for, is the additional 9 million . . . that they had to incur because of the actions of Taktl.").

Furthermore, Farrell testified that he derived the markup profit percentage from IWR's estimate which indicated that it would make a 20% profit on project costs.  Id. at 19 (Farrell Dep. 69:1–11); see also id. 72:7–11 ("[T]hey are entitled to a 20 percent profit on the costs that they incurred . . . whether they make a profit or not on an overall basis has nothing to do with this claim.").  Accordingly, Farrell "adequately outlines the underlying methodology for his opinions and demonstrates familiarity with the relevant data in the case."  Warren Hill, LLC v. Neptune Invs., LLC, No. CV 20-452, 2021 WL 2044389, at *6 (E.D. Pa. May 20, 2021)

While TAKTL alleges that Farrell failed to consider variables and facts beyond those provided by defendants, whether he "should have considered more" is "an issue that goes . . . to the weight, rather than the admissibility" of his testimony.  T.N. Incorporation, Ltd. v. Fid. Nat'l

Info. Servs., Inc., No. CV 18-5552, 2021 WL 5980048, at *10 (E.D. Pa. Dec. 17, 2021); see also Marcum, 549 F. Supp. 3d at 418 (E.D. Pa. 2021) ("Whether Ingram should have done more research and performed more calculations is an appropriate issue for cross-examination at trial."). Likewise, "[a]n expert is permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." Walker v. Gordon, 46 F. App'x 691, 695–96 (3d Cir. 2002). Thus, it was permissible for Farrell to limit his analysis to the factors and variables that were relevant to IWR's version of the disputed facts. And TAKTL remains free to explore any limitations or deficiencies in his evaluation "through effective cross-examination." Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002).

With respect to TAKTL's contention that Farrell "relied solely on [IWR]'s representations" without independently verifying the data IWR provided, TAKTL points to certain assumptions Farrell made and some of the sources of information he relied on. First, TAKTL asserts that Farrell improperly relied upon summaries and ledgers derived from IWR's accounting records to determine IWR's legal fee damages, domestic air travel costs, and the number of unanticipated manhours it incurred correcting TAKTL's performance. TAKTL argues that Farrell should have independently verified the data in these summaries and ledgers with IWR's records, such as invoices or receipts. Second, it challenges Farrell's assumptions regarding IWR's profit markup percentage, AGT's damages, and the labor wage rates. According to TAKTL, these assumptions are unsupported by the record and based entirely upon IWR's say-so.

Initially, the court notes that Farrell "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. So, he "need not base his opinion on first-hand knowledge, and in fact can rely on observations made by others as well as their own expertise." Corner Pocket, Inc. v. Travelers Ins., No. CIVA. 12-288, 2013 WL 3993967, at *6 (W.D. Pa. Aug. 5, 2013).

Turning to TAKTL's allegation that Farrell improperly relied on summaries and ledgers without verifying the information therein, the court finds this argument unpersuasive. TAKTL fails to show how Farrell's lack of review of any "particular set of documents in relation to all of the other records he reviewed renders his testimony unreliable." Warren Hill, 2021 WL 2044389, at *5. While TAKTL "may raise valid arguments" about Farrell's reliance on IWR "for certain numbers in his calculations or other instances in which he did not perform independent verifications," his "testimony need not be without flaw, based on the best methodology, or even come to the right conclusions as long as there are still good grounds to hold those opinions." Id. at *7.

And TAKTL's second allegation regarding Farrell's "unverified assumption[s]" equally is without merit. ECF No. 177 at 14. First, Farrell included AGT's damages "[t]o assist the trier of fact in understanding IWR damages" and stated that "IWR [m]anagement . . . will speak to the history and background for these damages" during their testimony. ECF No. 177-1 ¶ 103. Farrell testified that the purpose of including AGT's damages in his report was "strictly to have one place for any prior effect, to have all the damages summarized in one place." ECF No. 192-2 at 23 (Farrell Dep. 88:1–2); see also ECF No. 177-1 ¶ 102 ("IWR through its subcontractor AGT, was responsible for the installation of the curtain wall.").

Second, Farrell explained that he derived the markup percentage (20%) from the documents that IWR "used to prepare [its] estimate, or [its] bid . . . at the beginning of the project." ECF No. 192-2 at 20 (Farrell Dep. 74:25–75:3). Lastly, with respect to labor wage rates, Farrell testified that the Project was "a union job," so "anybody in the field, including the shop, would have been union employees." ECF No. 192-2 at 15 (Farrell Dep. 56:8–12). Accordingly, to determine the "adjusted labor wage rates," Farrell explained that he deducted the amount of profit

from the rates set forth in the union "rate structure" that IWR had "put together" with the Project's construction manager.  ECF Nos. 192-2 at 15 (Farrell Dep. 55:20–25); 177-1 ¶ 41.

Based on the foregoing, the court finds that Farrell has "good grounds" for his "assumptions."  He clarified the limited purpose for including AGT's damages in his report in light of its relationship to IWR.  In addition, he could adequately support his reasoning for the markup percentage with facts in the record.  And finally, he sufficiently explained the methodology and data underpinning his "adjusted labor wage rates" such that his opinions should not be precluded.

TAKTL is "welcome to conduct 'vigorous cross-examination' and present contrary evidence and testimony to dispute any flaws" it sees in Farrell's opinions.  Warren Hill, 2021 WL 2044389, at *7 (quoting Daubert, 509 U.S. at 596).  But because his opinions are sufficiently premised on his knowledge, experience, and facts in the record to satisfy the reliability prong, "[t]hese conventional devices, rather than wholesale exclusion . . . are the appropriate safeguards."  Daubert, 509 U.S. at 596.

Turning to the third requirement of Rule 702, the court finds that Farrell's testimony "fits" because there are good grounds to believe it would help the jury decide a factual dispute.  To determine whether an expert's testimony "fits" the proceedings, the trial court asks "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  United States v. Schiff, 602 F.3d 152, 173 (3d Cir. 2010) (quoting Daubert, 509 U.S. at 591).  This requirement goes primarily to relevance.  See Daubert, 509 U.S. at 591.  Even if an expert's testimony is based on their specialized knowledge, "the testimony will be excluded if it is not knowledge related to the purposes of, or pertinent inquiry to, the case."  Jones, 643 F. Supp. 3d at 563.  Farrell's testimony plainly meets this standard as it will assist the jury in understanding the evidence as it relates to IWR's damages claims.  Accordingly, the court finds that the fit prong is satisfied.

Nonetheless, TAKTL argues that Farrell's testimony does not fit the facts of the case because he relied upon the report of defendants' delay and disruption expert, Philip Urwin, in rendering his opinions (the "Urwin Report").  And the Urwin Report, according to TAKTL, is unreliable because it is contradicted by the testimony of defendants' shop drawing experts, David Nasser and Christopher Kercsmar.  So, Farrell's testimony should be excluded because he relied upon Urwin, who, in turn, is contradicted by Nasser and Kercsmar.

The court rejected this argument when it denied TAKTL's motion to exclude Urwin's expert report and testimony.  <u>See</u> ECF No. 228.  TAKTL asserted the same position as it does here—that Urwin's opinions are contradicted by Nasser and Kercsmar and, therefore, do not fit the facts of the case.  <u>See</u> ECF No. ECF No. 179 at 9–12.  The court will neither reengage in an in-depth discussion of this argument nor recite its reasoning for rejecting it.  Because TAKTL's position is predicated upon the admissibility of Urwin's testimony, the court finds that its argument with respect to Farrell's opinions also fails.  Farrell is entitled to rely on the Urwin Report "as it is well-settled that one expert may rely upon another expert's opinion in formulating his own." <u>Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.</u>, 286 F.R.D. 266, 271 (W.D. Pa. 2012).

Besides Farrell's reliance on Urwin, TAKTL does make an original, yet similar, argument regarding the fit of his testimony—that his opinions are contradicted by defendants' prior admissions.  In his report, Farrell states that "[i]t is my understanding that TAKTL is responsible for delays after December 2016."  ECF No. 177-1 ¶ 51.  TAKTL argues that this "blind assumption" disregards the allegations defendants made in a separate lawsuit filed in the Eastern District of Missouri.

In that matter, defendants brought breach of contract claims against Wheaton, alleging, <em>inter alia</em>, that their work was delayed as a result of Wheaton's failure to provide timely shop drawings in accordance with the Project's schedule.  <u>See</u> ECF No. 1-1 ¶ 21, <u>All. Glazing Techs.</u>,

Inc. v. Wheaton & Sprague Eng'g, Inc., 4:19-CV-1889-RWS (E.D. Mo. Jul. 3, 2019). Defendants settled their claims against Wheaton in February of 2022. ECF Nos. 183–84. TAKTL argues that Farrell failed to account for the delay attributable to Wheaton and the settlement amount IWR received as a result thereof. Therefore, his damages calculations—premised on the assumption that TAKTL was solely responsible for the delays—are inflated and assertedly do not fit the facts of the case.

This argument is just as unconvincing as its predecessor. First, Farrell published his expert report in January of 2021. ECF No. 177-1 at 2. Less than two months later, he was deposed. ECF No. 177-2 at 2. How, then, was Farrell supposed to deduct a settlement reached nearly a year later?

Second, defendants are not offering Farrell's testimony to prove liability. Rather, he is offered to show the amount of damages under defendants' theory of liability. Farrell is entitled to base his damages report on the assumption that TAKTL is solely responsible for the delays because "all damages expert opinions are dependent on the assumption that liability has been proven." Rhoads Indus., Inc. v. Shoreline Found., Inc., No. CV 15-921, 2021 WL 2778562, at *30 (E.D. Pa. July 2, 2021) (cleaned up). Since TAKTL's argument attacks liability, it is not a valid reason for a Daubert challenge against a damages expert. Accordingly, because there are good grounds to believe Farrell's testimony will help the jury decide a factual dispute, Daubert's "fit" requirement is satisfied.

Finally, TAKTL contends that to the extent Farrell "intends to opine on the parties' duties and the elements of their claims," such opinions should be excluded as improper legal conclusions. ECF No. 177 at 13. In particular, TAKTL points to the Farrell Report's rebuttal section where he states, "[i]t is TAKTL and the [December] Report's duty to prove with reasonable certainty that TAKTL suffered damages . . ." before concluding that "[t]he [December] Report fails to establish

13

reasonable certainty that a damage even occurred, and furthermore, the methodology it uses to compute TAKTL's lost profits is highly speculative and fails to consider numerous risks associated with the Chad Embassy Project."  ECF No. 177-1 ¶¶ 168–69.

While Federal Rule of Evidence 704 permits expert testimony to embrace an ultimate issue that the trier of fact will decide, it may not offer legal conclusions.  See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006).  "Such testimony . . . would usurp the District Court's pivotal role in explaining the law to the jury."  Id. (citing First National State Bank v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981)).  Similarly, "[e]xpert testimony which 'merely tell[s] the jury what result to reach' is improper."  Maude v. City of Philadelphia, 507 F. Supp. 3d 593, 605 (E.D. Pa. 2020) (second alteration in original) (quoting Fed. R. Evid. 704 advisory committee's note).

With these principles in mind, the court holds that Farrell may not opine on the burden of proof for lost damages, nor whether TAKTL has met that burden.  Having reviewed the Farrell Report, this court agrees with TAKTL that these aspects of Farrell's opinion are an improper attempt to usurp the court's and jury's role.  See Harbor Compliance Corp. v. Firstbase.io, Inc., No. 5:23-CV-0802, 2024 WL 1442165, at *14 (E.D. Pa. Apr. 3, 2024) (finding rebuttal expert's opinion that opposing party's damages expert "failed in proving damages with 'reasonable certainty'" inadmissible as an improper legal conclusion).  Therefore, paragraph 168 and the first segment of paragraph 169 ("The Gleason Report fails to establish reasonable certainty that a damage even occurred . . . ") will be struck from the Farrell Report and he will be prohibited from testifying to the same.[2]

---

[2]  To the extent his testimony is consistent with the second segment of paragraph 169, Farrell is free to opine on the adequacy of the basis underlying the December Report's lost profits calculations.  See United States v. Basroon, 38 F. App'x 772, 777 (3d Cir. 2002) (finding that an expert did not impermissibly opine on another witness's credibility when he commented on the inadequacy of the witness's explanation); see also In re Payment Card Interchange Fee & Merch.

Accordingly, TAKTL's motion will be granted to the extent it seeks to prohibit Farrell from testifying as to the burden of proof for lost damages and whether it has been met and insofar as it seeks to strike those portions of his expert report (as reflected above). In all other aspects, the court finds that defendants have met the foundational requirements of Rule 702 and plaintiff's Daubert motion will therefore be denied.

### B. Defendants' Motion to Exclude Mark Gleason and Gregory Landgraf

As discussed above, TAKTL proffers an affirmative expert report (the "December Report") and a rebuttal report (the "February Report"), both of which were co-authored by its damages experts, Mark Gleason ("Gleason") and Gregory Landgraf ("Landgraf"). Defendants move to exclude Gleason and Landgraf's expert reports and proffered testimony under Rule 702, or in the alternative, to limit their testimony such that only one expert may testify. ECF No. 183. TAKTL indicates in its brief in opposition that it will only call Gleason to testify on damages at trial. ECF No. 189 at 2 n.1. Therefore, defendants' request for alternative relief will be denied as moot and the court's analysis of defendants' motion will focus primarily on Gleason.

Although defendants point to *many* alleged deficiencies in the proffered reports and testimony, their arguments, for the most part, only attack the reliability of Gleason's opinions. Specifically, defendants contend that he relied upon information provided by TAKTL without independently verifying it and there is too great of an analytical gap between such data and his opinions. With respect to his alleged lack of verification, defendants argue that Gleason failed to verify various reports TAKTL generated "for purposes of this litigation," as well as estimates provided to him by TAKTL's founder and managing member, Lauren Flannery ("Flannery"). ECF

---

Disc. Antitrust Litig., 638 F. Supp. 3d 227, 307 (E.D.N.Y. 2022) ("As a rebuttal expert, Mr. Kaplan may critique Plaintiffs' experts' models from an economic perspective, but he may not instruct the jury on what is 'critically important' in a damages model.").

No. 185 at 15–19.  And as for the latter issue, they argue that Gleason improperly relied upon the Amended Complaint, a time log created by Flannery, and facts which are either contrary to the record or entirely speculative.  Id. at 11–15, 19–22.

TAKTL counters that defendants' efforts are "an improper attempt to prematurely adjudicate the merits of this case and rob the factfinder of its opportunity to assess the credibility of" Gleason.  ECF No. 189 at 4.  The court agrees with TAKTL and finds that Gleason's opinions meet the foundational requirements for admission under Rule 702.  In so finding, the court believes defendants' challenges are best reserved for cross-examination at trial.  Therefore, their motion will be denied.

As an initial matter, Gleason possesses the requisite qualifications.  As a CPA with an Accredited in Business Valuation ("ABV") certificate, Gleason has more than thirty-five years of experience in finance, accounting, and business planning and valuations.  ECF No. 189-1 ¶ 20.  He also has been accepted as a damages expert in proceedings across the United States, including in this District, see, e.g., Adani Exports Ltd. v. AMCI (EXPORT) Corp., No. 02:05-CV-0304, 2009 WL 137321, at *3 (W.D. Pa. Jan. 21, 2009) (accepting Gleason as qualified to testify as a damages expert); Wonderland Nurserygoods Co. v. Thorley Indus. LLC, No. 2:13-CV-00387, 2015 WL 5021416, at *18 (W.D. Pa. Aug. 21, 2015) (denying motion to exclude Gleason's testimony under Rule 702), as well as in similar breach of contract disputes in our sister districts.  See Allied Erecting & Dismantling Co. v. U.S. Steel Corp., No. 4:12-CV-1390, 2015 WL 1530648, at *16 (N.D. Ohio Apr. 6, 2015) (denying motion to exclude Gleason's expert testimony on damages related to delay, disruption, and lost profits in contract dispute).  As such, this court finds that Gleason is qualified under Rule 702 to render an expert opinion on TAKTL's damages and the findings in the Farrell Report.

Turning to the crux of defendants' motion: reliability.  With regard to an expert's reliance on the estimates of others, the Third Circuit has found that such reliance may be appropriate "in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable."  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 292 (3d Cir. 2012).

With respect to Gleason's reliance on estimates from Flannery, the court notes that defendants' arguments correlate to five footnotes within the twenty-six pages of his exhibit list—accompanying his twenty-eight-page December Report—which cite "discussions with L. Flannery" as his source of information.  See ECF No. 184-5 at 5 n.c, 9 n.b, 14 n.b, 15 n.b.  The averages Flannery provided relate to the number of fabrication tickets a drafter can produce per day, the amount of trim scrap TAKTL expects on all projects, TAKTL's production rate in square footage per minute and minutes per panel, and the labor hours required to produce a custom mold and its accompanying carrier.

Gleason acknowledged that he relied upon on TAKTL's expertise for information regarding the manufacture of specialty concrete panels, such as the typical amount of trim scrap expected on a project.  ECF No. 184-2 ¶ 46.  He explained, however, that while some of the data he relied upon came from discussions with TAKTL regarding "the nature of [its] business and various aspects of its production processes," he used "the documents and information available to [him] to corroborate such statements when possible."  ECF No. 184-1 ¶ 26.  Those documents, as TAKTL points out, consist of over 2,300 pages of, inter alia, "pay stubs, earnings statements, purchase orders, schedules, and invoices."  ECF No. 189 at 9.  Gleason further explained that "[i]n all instances in which we have relied on TATKL's expertise, we have done so only after extensive discussions by which we established an understanding of who prepared the information, the source data used, and the methodology employed."  ECF No. 184-2 ¶ 46

Clearly, Gleason knew who prepared the estimates he relied upon and her qualifications for doing so. Moreover, each estimate supplied by Flannery represents *one* figure in only *five* out of the ten categories of damages Gleason calculated. Defendants do not contend that these estimates are the "linchpin" of Gleason's opinions—instead, his mere reliance on Flannery appears to be their sole basis for exclusion. See Legendary Art, LLC v. Godard, No. CIV.A. 11-0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012) (excluding expert testimony where "the profit and loss projections supplied by [plaintiff] . . . [were] the linchpin of [his] opinion."). But Gleason's reliance on Flannery, standing alone, does not automatically render his opinions unreliable. Indeed, Gleason could articulate a reasonable explanation as to why he relied upon Flannery's estimates and why he believed they were reliable. Accordingly, this court finds that he has demonstrated "good grounds" for the estimates underlying his damages calculations. ZF Meritor, 696 F.3d at 292.

Similarly, defendants assert that Gleason calculated the "Unpaid Contract Price" by relying on the amount alleged in the First Amended Complaint. ECF No. 184 at 11–12. Defendants further point out that because TAKTL does not maintain time records for its personnel, in order to determine how many hours its employees spent on the Project Flannery had to review email correspondence and create a summary of the dates TAKTL's personnel worked on the Project and the percentage of time they spent on the same (the "Time Log"). Id. at 13. And, finally, TAKTL purportedly generated various reports "for purposes of this litigation" regarding the costs of drafting, project management, yield, and scrap (the "Reports"). Id. at 18, 25. Defendants argue that Gleason improperly relied upon the foregoing materials to calculate TAKTL's damages without independently verifying the information therein.

But the record reveals that defendants overstate Gleason's reliance on the materials and the impropriety of doing so. First, Landgraf testified that they included the "Unpaid Contract Price"

from the First Amended in their report "for the sake of completion" and that their role was "just to add up the numbers." ECF No. 184-3 at 16 (Landgraf Dep. 63:3–6). This is an explanation that by all accounts is not dissimilar from the one Farrell gave for including AGT's damages in his report. Likewise, the Reports that Gleason utilized are akin to the summaries and ledgers from IWR that Farrell relied upon. Like TAKTL, defendants fail to show how Gleason's lack of review of any "particular set of documents in relation to all of the other records he reviewed renders his testimony unreliable." Warren Hill, 2021 WL 2044389, at *5.

Next, Gleason clarified that through "extensive interviews with TAKTL management," he "developed an understanding of the specific TAKTL project management personnel included" in the Time Log and "the source of the information being provided." ECF No. 184-2 ¶ 40. Moreover, Gleason explained that the Time Log is supported by "contemporaneous email correspondence" and that "TAKTL personnel is prepared to testify to the technical explanations of the project management tasks which are beyond the scope of [his] expertise." Id. ¶¶ 16, 40.

If the court examined the December Report as defendants so urge, "the court's determinations regarding the veracity, reliability, or weight of isolated statements in the report would be without the benefit of the context to be provided by other evidence, [and it is this] context in which the report as a whole must be considered." Clark v. Richman, 339 F. Supp. 2d 631, 648 (M.D. Pa. 2004). And when considering Gleason's opinions in their entirety and the context that other evidence will provide, the methodology used to create the Time Log and Gleason's explanation for relying on it are sufficiently reasonable. See Warren Hill, 2021 WL 2044389, at *7 ("[W]e note that Couillard's testimony need not be without flaw, based on the best methodology, or even come to the right conclusions as long as there are still good grounds to hold those opinions.").

Lastly, Gleason's alleged reliance on facts that are either contrary to the record or entirely speculative are arguments which go to the weight of his testimony, not its admissibility.  Because "[a]n expert is permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury," then defendants can explore the facts and assumptions underlying Gleason's opinions—and any documents that are contrary thereto—on cross-examination.  Walker, 46 F. App'x at 695–96.  Moreover, the purportedly "speculative" facts that Gleason relied on concern his lost profits calculations.  But "in assessing damages, particularly those for lost profits, we recognize the inevitability of some imprecision of proof, and note that certainty as to the amount of damages is not required."  Scully v. US WATS, Inc., 238 F.3d 497, 515 (3d Cir. 2001) (quoting Commonwealth Assocs. v. Palomar Med. Techs., Inc., 982 F. Supp. 205, 208 (S.D.N.Y. 1997)).  Since "[t]he role of a damages expert is to calculate hypothetical damages given an assumed set of facts," Gleason may base his lost profits calculations on "a particular factual scenario . . . as posited by or on behalf of" TAKTL.  Brill v. Marandola, 540 F. Supp. 2d 563, 570 (E.D. Pa. 2008).  Accordingly, because defendants' challenges go to the weight of Gleason's testimony and there are "good grounds" for his opinions, the reliability prong of Rule 702 is satisfied.

Finally, although not disputed here, the court finds that Gleason's testimony "fits" because it will assist the jury in understanding the evidence as it relates to TAKTL's damages claims and the Farrell Report.  For these reasons the fit prong is satisfied.

Having established that Gleason is a qualified expert, his opinions are sufficiently reliable, and there are good grounds to believe that his testimony will be helpful to the jury, plaintiff has met the foundational requirements for admission under Rule 702.  Therefore, defendants' Daubert motion will be denied.

**C.  Conclusion**

Based on the foregoing, plaintiff's motion to exclude the expert testimony and report of James V. Farrell will be granted in part and denied in part. The motion will be granted to the extent it seeks to prohibit Farrell from testifying as to the burden of proof for lost damages and/or whether it has been met. The motion will be denied in all other aspects. Defendants' motion to exclude the expert testimony and report of Mark M. Gleason and Gregory Landgraf will be denied. An appropriate has been issued.

Date: October 4, 2024

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:     Brian P. Maloney, Esquire
        Chad Allen Wissinger, Esquire
        Julie A. Mueller, Esquire
        Connor P. Sease, Esquire
        Jayme L. Butcher, Esquire
        Wellford H. Winstead, Esquire
        Brandon A. Levey, Esquire
        Mark A. Packman, Esquire
        Michael Rush, Esquire
        Shawna J. English, Esquire

        (*Via CM/ECF Electronic Mail*)