**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TAKTL, LLC** a limited liability company, ) | |
| ) | |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | |
| v. ) | 2:18cv1546 |
| ) | **Electronic Filing** |
| **IWR, NORTH AMERICA, LLC** ) | |
| a limited liability company formerly known ) | |
| as IWR BUILDING SYSTEMS, LLC and ) | |
| **ALLIANCE GLAZING** ) | |
| **TECHNOLOGIES, INC.** ) | |
| ) | |
| Defendants/Counterclaim Plaintiffs. ) | |

**OPINION**

TAKTL, LLC ("TAKTL" or "plaintiff") commenced this civil action against IWR North

America, LLC ("IWR"), and Alliance Glazing Technologies, Inc. ("AGT") (collectively,

"defendants") for the breach of a commercial construction contract involving the manufacture of

specialty concrete panels.  Defendants asserted counterclaims for breach of contract and related

damages.  In November of 2024, this matter was tried before an advisory jury during a two-week

trial.  See ECF Nos. 275–80; 281–83; 286–90.  The parties have submitted post-trial proposed

findings of fact and conclusions of law regarding the limitation of liability provisions in the

relevant contracts.  ECF Nos. 316–20; 322–27.  Pursuant to Federal Rule of Civil Procedure

52(a), the court's findings of fact and conclusions of law on the limitation of liability provisions

are set forth below.

### I.  Findings of Fact

This action arises out of two contracts: one between IWR and TAKTL and one between

AGT and TAKTL.  Both contracts relate to construction projects at the Washington University

Medical Center in St. Louis, Missouri.  See Pretrial Stip. (ECF No. 256) at 12.  The general

contractor of these projects hired IWR, a contractor specializing in exterior enclosures for large

commercial buildings, to construct the façades for two buildings on the medical campus, the Barnes-Jewish Hospital North Building and the St. Louis Children's Hospital (collectively, the "Project"). Id. ¶¶ 2, 4–5. IWR subcontracted with AGT, a specialty contractor focused on building façades, to construct the "curtain wall" portions of both buildings. Id. ¶¶ 2, 7. AGT subsequently contracted with TAKTL, a Pennsylvania-based manufacturer, for ultra-high-performance concrete ("UHPC") panels for its scope of work on the exterior enclosures. Id. ¶¶ 1, 10. Thereafter, IWR separately contracted with TAKTL to provide UHPC panels for the non-curtain wall portions of the façades. Id. ¶ 9.

AGT purchased panels from TAKTL through Purchase Order No. 15-1754. Id. ¶ 13. On March 5, 2015, TAKTL issued its price quotation to AGT, which included its terms and conditions of sale. Id. ¶ 27. Purchase Order 15-1754 was finalized on March 20, 2015 and it specifically incorporated TAKTL's quotation dated March 5, 2015 (the "AGT Purchase Order"). Id. ¶¶ 15, 29. Under the terms of this purchase order, AGT agreed to pay TAKTL $1,008,247.22 to manufacture and deliver panels for the curtain wall portions of the Project. Id. ¶ 30. It also agreed to pay $206,750 for crating and freight costs, which brought the total contract price to $1,214,997.22. Id. Eventually, this total increased to $1,391,580.35 as a result of several change orders. Id. ¶ 32.

TAKTL's terms and conditions of sale contained the following provision:

**LIMITATION OF LIABILITY:** In no event will TAKTL be liable for any incidental, consequential, special, punitive, statutory, or indirect damages, including without limitation, loss of profits, revenue, or use. The aggregate liability of TAKTL related to the order will in no case exceed the initial order price. To the extent permitted by applicable law, these limitations and exclusions apply if liability arises from breach of contract, indemnity, warranty, tort (including negligence), operation of law, or otherwise.

Pl. Ex. 1174 at 5.

As for IWR, it submitted Purchase Order 2254 to TAKTL on August 26, 2015. Pretrial Stip. (ECF No. 256) ¶ 18. TAKTL signed Purchase Order 2254 the same day and returned it to IWR with two exhibits attached thereto. Id. ¶ 19; Trial Tr., Nov. 19, 2024 (ECF No. 297) at 88:11–90:22. The first exhibit was titled "EXHIBIT A TO IWR BUILDING SYSTEMS PURCHASE ORDER 2254" (hereinafter "Exhibit A"). Pl. Ex. 1220 at 13. Exhibit A provided, in relevant part:

> **Warranty:** The TAKTL standard 10-year warranty shall be applicable to the materials supplied under this purchase order, as attached hereto in Exhibit B. The remedies contained therein shall be [IWR's] sole and exclusive remedy for breach of warranty and all other remedies available at law or in equity are expressly excluded.
>
> **Right to Cancel:** If the contract is terminated by [IWR] for convenience, [TAKTL] shall be entitled to recover costs incurred through the date of termination, together with corresponding overhead and profit. In any case, any such claim shall not exceed the original purchase order value.
>
> **Schedule:** [TAKTL] will commence the Work in sufficient time to deliver the Material in accordance with [TAKTL's] lead time from the date of receipt of deposits, final shop drawings and written notice to proceed.

Id. As referenced in the warranty clause, the second exhibit attached thereto was subtitled "LIMITED PRODUCT WARRANTY" (hereinafter "Exhibit B"). Id. at 14. Exhibit B, in turn, contained provisions detailing TAKTL's warranty coverage, exclusions, and the procedures for submitting claims. Id. The final section of Exhibit B provided:

> LIMITATION OF LIABILITY: TAKTL shall not be liable under any circumstances for any loss, damage or expense directly or indirectly arising from the use of the products sold hereunder or from any other cause, and TAKTL shall not be liable for any circumstances of consequential or incidental damages.
>
> The liability of TAKTL for breach of warranty hereunder is, in all instances, limited solely and exclusively to one of the following at the option of TAKTL: (a) the repair or replacement of defective products, or (b) the repayment of the purchase price paid for products confirmed by TAKTL to be defective. TAKTL will not be liable for any delay or failure to deliver caused by acts of God, strikes or any other cause beyond its control. The estimated ship date issued at time of release of order to production supersedes all prior estimated ship dates.

**THIS WARRANTY IS EXCLUSIVE AND IS IN LIEU OF ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHER WARRANTY OF QUALITY, WHETHER EXPRESS OR IMPLIED, EXCEPT THE WARRANTY OF TITLE AND AGAINST PATENT INFRINGEMENT.**

Id.

IWR sent TAKTL the completed purchase order, signed by both parties, on September 15, 2015.  Pretrial Stip. (ECF No. 256) ¶ 19.  Specifically, IWR's project manager, Eric Youngblood ("Youngblood"), sent an email stating, "Please see attached [the] fully executed PO for the IWR portion of the BJC project(s) as previously discussed."  Pl. Ex. 1220 at 1.  The attachment to this email included Purchase Order 2254 signed by both parties, as well as Exhibits A and B (collectively, the "IWR Purchase Order").  Id. at 2–14.

In addition, Youngblood had made some handwritten notations on Exhibit A.  Trial Tr., Nov. 19, 2024 (ECF No. 297) at 89:8–10.  After both the "warranty" and "right to cancel" provisions, he wrote "OK" followed by his initials.  Trial Tr., Nov. 20, 2024 (ECF No. 302) at 6:15–24.  Under the "schedule" clause, Youngblood wrote: (1) "paid per terms" under the word "deposits;" (2) "provided for start" under "final shop drawings;" and (3) "PO executed" after "proceed."  Id. at 6:25–7:2.  The bottom of Exhibit A contained two signature lines—one for IWR and the other for TAKTL.  Pl. Ex. 1220 at 13.  TAKTL's Chief Financial Officer had signed for TAKTL, but Youngblood returned Exhibit A with IWR's signature block blank.  Trial Tr., Nov. 19, 2024 (ECF No. 297) at 88:22–24.  However, he had signed the first page of the agreement on behalf of IWR.  Id. at 90:3–5.

Under the terms of the IWR Purchase Order, IWR agreed to pay $1,601,678.95 for 83,232 ft$^2$ of TAKTL panels.  Pretrial Stip. (ECF No. 256) ¶ 20.  It also contained IWR's standard terms and conditions for such orders.  Trial Tr., Nov. 19, 2024 (ECF No. 297) at 77:20–78:1.  These terms and conditions included, *inter alia*:

4

**ACCEPTANCE** By acceptance of this order [TAKTL] agrees to the terms and conditions hereof, contrary terms in any quotation, acknowledgement or other communication notwithstanding.

**EXCESS QUANTITY** [IWR] assumes no liability for materials produced, purchased or processed in excess of the amount called for by this order.

…

**PRICE** [TAKTL] agrees that the materials, services, or articles specified herein will be furnished at a price no higher than that when last purchased or at a price no higher than that specified herein, unless [IWR] is notified of the new price in writing and [TAKTL] will not proceed with the order until acceptance of the new price by [IWR] is furnished in writing.  [TAKTL] agrees that all material, services or articles furnished hereunder are in compliance with all provisions of government laws, orders and regulations relating to price control.

…

**CHANGES IN SPECIFICATIONS** [IWR] shall have the right by written order to make changes from time to time in the work to be performed or the materials to be furnished by [TAKTL] hereunder.  If such changes cause an increase or decrease in the amount due under the order or in the time required for its performance, an equitable claim for adjustment must be asserted in writing fifteen (15) days from the date the change is ordered.  Nothing contained in this clause shall relieve [TAKTL] from proceeding without delay in the performance of this order as changed.

Pl. Ex. 1220 at 3.  Above these terms and conditions were six instructions, the last of which provided that "[a]ny changes against orders we cancel must be invoiced to us no later than 10 days after cancellation date."  Id.

The total price of the IWR Purchase Order increased by at least approximately $123,000 due to the following change orders: (1) Change Order #2 dated May 3, 2016 for custom oversized molds and mold extensions for $82,500.00; (2) Change Order #4 dated January 27, 2017 for replacement panels for $30,828.18; and (3) Change Order #5 dated March 31, 2017 for replacement panels for $9,790.46.  Pretrial Stip. (ECF No. 256) ¶ 34.

On March 7, 2016, TAKTL's director of project management, Jeremy Smith ("Smith"), sent a letter to Youngblood advising that TAKTL was encountering "ongoing issues" with the shop drawings that had been provided.  Pl. Ex. 543 at 1.  Smith wrote, in relevant part:

As you know, processing material in a single release is necessary for managing casting, cutting, drilling, and crating. This is how we priced the project. However this project is bifurcated into two purchase orders with two companies (AGT/IWR) and two schedule tracks, which we accommodated without impact to our pricing. Your schedule timing has necessitated breaking further breaking this into partial releases, which we have also been accommodating despite the fact that this creates inherent inefficiencies and additional costs to our fabrication ticket work and manufacturing process.

As we have been discussing over the past few months, we now face a compression of the schedule for deliveries. We have made commitments to improve upon the delivery rate stated in our quoted terms — but from the start we have expended a great deal of time in correcting or clarifying drawings provided to us. When all compensation for drawing work was eliminated from our scope, it was our explicit expectation that the live CAD files we received would be translatable directly to our fabrication tickets. As you know this has not been the case.

We continue to find and process requests for clarifications and requests for missing drawings from the various releases of drawing files we have received. This unfortunately continues as we make our way through both IWR and AGT's scopes of work. Approximately 160 panels and counting are currently affected within these first two releases. These panels and adjacent panels are not being translated to fabrication tickets and therefore are not scheduled for casting at this time. More importantly it is affecting our ability to give our production team the information required to support your delivery schedule.

…

We are consuming valuable time resources in drawing review and translation, far beyond what was anticipated or agreed to, and we will be looking to quantify and seek compensation for these efforts. In addition, the delivery schedule for material will likely be impacted by the delays the continuation of this unanticipated process has created.

…

As impacts are encountered we will update you as to the delivery schedule impact, and will address the cost impacts to the project as we progress.

Id. at 1–2. On May 3, 2016, Steve Swartz ("Swartz"), TAKTL's senior project manager, sent a

similar letter to IWR's project director, Todd Staley. Pl. Ex. 682. Swartz wrote, in relevant part:

Because it is apparent that [TAKTL's] good faith efforts have worked to the detriment of our reputation and financial position on this project, we must at this point clarify responsibilities and terms of our engagement and submit change orders to square the costs we've incurred to address issues created by changes to the original scope and failure to provide timely drawings by IWR.

…

6

Summarizing the sequence of [] events:

Panel layout drawings were not provided.  This is a set of annotated drawings that shows the location of each individually labeled panel based upon size and fastening location, and is standard in the industry.  Yet, we have been unable to confirm that your team understands what panel layout drawings are and why they are necessary.  Clearly, there is a fundamental disconnect here that is beyond our control.  We have never had this problem with an installer before.  Wheaton and Sprague knows what is needed and is capable of providing those drawings, but they were not contracted to do so.  TAKTL is also capable of providing these drawings, yet this was explicitly removed from our scope.  Kevin Gannon and I have had numerous and time consuming discussions explaining the risks of proceeding with fabrication drawings directly from details and elevations that do not have tags or fastening locations particularly given the numerous detail conditions: sills, window returns, etc.  As a result of not being provided this information in the requested format, we have had a very experienced architectural detailer working for months full-time trying to coordinate the panel layout, resolve the discrepancies between the various drawings provided to us and produce final fabrication tickets.  This process is ongoing and to date has excluded the SLCH Building and the top floors for which we still have no approved shop drawings.  Please find Change Order 1 attached for the work to date.  I will hold any further detailing until this Change Order has been approved and we are authorized to proceed with additional work.

Oversized panel sizes required.  In working through the drawing package, we found oversized panels at intermittent locations throughout the project.  Since our maximum panel size was 7', we had not cast 10' blanks and were not prepared for longer parts.  By the time the drawings were actually released to us in January, we had very little time to react to either the substandard drawings or the oversized panel requirements.  At the point we determined the scope of the problem and the approximate number of parts involved, we built 100 ten-foot flat molds and have since lengthened the custom ribbed molds to accommodate.  Unfortunately, the shipment sequence demanded the longer flat panels in the first shipment, and that was well inside of the lead time for custom mold fabrication, mold conditioning, casting, curing, and postprocessing.  **Please find Change Order 2 attached for costs incurred.**

…

Project schedule.  The project schedules have never been adjusted to account for the late releases or terms of TAKTL's agreement.  Even prior to receiving a drawing release, which as stated above is still incomplete, we were under pressure to accelerate production to accommodate for the late releases.  As stated above, production of panels and molds was pushed ahead without full information in attempt to shorten the lead times, which for some elements was quoted as 20 weeks from full release.  Beyond shortening the initial lead time we were also asked to accelerate the delivery schedule beyond the clearly stated terms by another 30% at minimum in order to preserve IWR's commitments.  TAKTL has made every effort to accommodate this schedule at risk and expense to ourselves

7

even while continuing to operate without full or adequate information.  The schedule and process currently underway fails to account for a necessary review process involved in having a third party (TAKTL) provide the panel layout drawings, and is likely to result in additional installation accommodations and revisions being required which TAKTL should in no way be held responsible for. This should serve as notice that TAKTL's concessions regarding acceleration are made in a collaborative effort and are in no way to be taken as an agreement that our contractual obligations are other than stated explicitly in our agreements.

…

Please review the attached change orders and contact me with your decision to provide the IWR project deliverables to TAKTL or your full authorization to proceed without them.

Id. at 1–3.

As referenced above, two change orders were attached to Swartz's letter.  The first, Change Order #1, requested an additional $34,000.00 for:

Drafting Work: 10 full time weeks at $85.00/hr for work completed to date. Excludes work yet to be completed for the SLCH Building and un-released upper floors of BJHN Building.  Drawing review is recommended to be performed confirming coordination with shop drawings.  Failure to provide scheduled time for review or the review itself will not constitute an agreement implicit or otherwise that TAKTL panel layout drawings are fully coordinated and accurate.

Pl. Ex. 546 at 6.  And Change Order #2 requested an additional $82,500.00 for:

Custom Oversize Molds: Required to accommodate oversized parts not included in the seven-foot maximum part originally quoted.  This includes: 100 ten-foot flat molds in Smooth texture.  30 mold extensions in Custom Rib texture.  TAKTL reserves the right to address future labor costs associated with oversized panels estimated at 20% increase.  Scope of required oversized parts to be determined based on final approved drawings.

Id. at 7.

On September 30, 2016, Youngblood emailed Swartz that "[b]ased on [the] field layout of [TAKTL] panels – we are needing to modify the return leg of the west facing panel for the bonded module . . . the drawings call it to be a 14" (ish) panel – based on the layout in the field it will need to be a 16" West facing leg."  Pl. Ex. 833 at 4.  A few days later, Swartz responded, "I'm going to have to charge for them, and I can't let it get in the way of closing out the group

8

that we are under a microscope for.  Fair?"  Id. at 3.  Youngblood replied, "I understand you will have to charge for them.  I just need to figure out who is paying me for it.  But I get it as long as you made them per the drawings you have to charge for them."  Id. at 2.

With respect to TAKTL's claimed damages, in addition to the outstanding balances of the IWR and AGT Purchase Orders and their respective change orders, TAKTL also sought several other categories of damages from defendants:

- Drafting costs.  This category of damages represents the excess hours that "TAKTL spent beyond what they expected to do with just fabrication drawings, because they ended up having to [draft] shop drawings in addition to the fabrication [drawings]."  Trial Tr., Nov. 18, 2024 (ECF No. 301) at 124:5–8.  To quantify these costs, TAKTL looked at the total number of drafting hours it spent on the Project, subtracted the number of hours it anticipated expending on the fabrication drawings, and then multiplied that difference by an average hourly rate.  Id. at 124:9–13.

- Project management costs.  This category of damages relates to the cost of dedicating "two or three individuals" to solve problems that "resulted from . . . late or erroneous or out-of-sequence drawings."  Id. at 128:13–17.

- Yield costs.  In TAKTL's typical manufacturing process, a certain amount of the material it produces will not be utilized for fabrication.  Id. at 131:1–3.  For the Project, TAKTL expected to lose 15% of its manufactured material, and the remaining 85% would be "yielding the material" for subsequent fabrication.  Id. at 131:11–14.  TAKTL included this expected yield percentage (85%) in its final quotation for IWR's scope of the Project. Id. at 94:17–24.  TAKTL alleged that it experienced reduced yield due to the "disorganized way that the defendants provided the information in the shop drawings."  Trial Tr., Nov. 26, 2024 (ECF No. 321) at 27:6–8.  This category of damages represents

the difference between TAKTL's expected yield percentage and the actual amount of material it yielded on the Project. Trial Tr., Nov. 18, 2024 (ECF No. 301) at 131:17–25.

- <u>Scrap costs</u>. Manufacturing scrap is material that has been rendered unusable due to a defect, such as a micro-crack or a color outside of TAKTL's readings. <u>Id.</u> at 19:9–12. TAKTL determined that it scrapped 18% of the total cast material for all the jobs it performed in 2016, excluding the Project. <u>Id.</u> at 139:3–12. It calculated a scrap rate of 24% for the Project. <u>Id.</u> at 139:13–17. TAKTL alleged that the Project's scrap rate was higher than anticipated because: (1) the product had to be "stored and moved around" after it began casting in the fall of 2015; (2) "the sequencing was suboptimal;" (3) the blanks for the oversized panels were too thin; and (4) it was "taking any means [it] could to try and accelerate [its] manufacturing process to meet the accelerated demands of [defendants]." <u>Id.</u> at 20:7–21:15. This category of damages represents the cost of sustaining a 6% higher scrap rate compared to the other projects TAKTL carried out that year. <u>Id.</u> at 139:18–23.

- <u>Inventory costs</u>. This group of damages is for the panels that ultimately remained in TAKTL's inventory after defendants "abruptly decided that they did not want the final shipments that [they] had ordered for the Project." <u>Id.</u> at 24:6–8.

- <u>Overtime labor costs</u>. This category of damages relates to the cost of TAKTL's employees working an abnormally high number of overtime hours on the Project "to meet the accelerated shipment schedule that [defendants] wanted." <u>Id.</u> at 28:20–25.

- <u>Mold costs</u>. This group of damages is for the additional molds and mold carriers that TAKTL made to increase its manufacturing capacity and accommodate the oversized panels that were larger than the contracts contemplated. <u>Id.</u> at 36:24–37:5.

- <u>Parallel plant costs</u>.  These damages are the costs associated with keeping two facilities open and operational in order to manufacture IWR and AGT's orders simultaneously and accommodate their accelerated production schedule.  <u>Id.</u> at 41:2–18.

### II.  <u>CONCLUSIONS OF LAW</u>

#### A.  **IWR's Damages Against TAKTL**

The court begins with the limitation of liability provision relevant to IWR's damages against TAKTL.  This provision is found in Exhibit B of the IWR Purchase Order and provides that "TAKTL shall not be liable under any circumstances for any loss, damage or expense directly or indirectly arising from the use of the products sold hereunder or from any other cause, and TAKTL shall not be liable for any circumstances of consequential or incidental damages."  Pl. Ex. 1220 at 14.

First, Exhibit B was included in the IWR Purchase Order.  In Pennsylvania, the interpretation of a contract is "a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement."  <u>In re Old Summit Mfg., LLC</u>, 523 F.3d 134, 137 (3d Cir. 2008) (quoting <u>Dep't of Transp. v. Pennsylvania Indus. for Blind & Handicapped</u>, 886 A.2d 706, 711 (Pa. Commw. Ct. 2005)).  In doing so, "the entire contract should be read as a whole, our interpretation must seek to give effect to all of its provisions, and we will not interpret one provision of a contract in a manner which results in another portion being annulled."  <u>AmerisourceBergen Drug Corp. v. Primrose Pharmacy, LLC</u>, No. CV 16-6106, 2021 WL 5631711, at *5 (E.D. Pa. Nov. 30, 2021).

"A writing is presumed to be the parties' entire contract when it appears to be 'a contract complete within itself' and conveys 'a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement.'"  <u>Patel v. Dhaduk</u>, 427 F. Supp. 3d 571, 580 (M.D. Pa. 2019) (quoting <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d 425, 436 (Pa. 2004)).  The

presence of an integration clause that states the writing is meant to represent the parties' entire agreement is "a clear sign" that the writing is fully integrated. <u>Yocca</u>, 854 A.2d at 436.

Moreover, "[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." <u>Huegel v. Mifflin Const. Co.</u>, 796 A.2d 350, 354–55 (Pa. Super. 2002). Finally, "Pennsylvania law follows the objective theory of contracts and therefore, looks to the parties' outward manifestations in determining whether they agreed to the terms of the agreement." <u>Great N. Ins. Co. v. ADT Sec. Servs., Inc.</u>, 517 F. Supp. 2d 723, 740 (W.D. Pa. 2007).

Applying the foregoing principles here, Exhibit B was included in the agreement between IWR and TAKTL. The IWR Purchase Order does not contain an integration clause stating that the writing represents the parties' entire agreement. <u>See</u> <u>Yocca</u>, 854 A.2d at 436. The "acceptance" clause in IWR's terms and conditions only provides that TAKTL agrees to the provisions therein, "contrary terms in any quotation, acknowledgement or other communication notwithstanding." Pl. Ex. 1220 at 3. This language does not indicate that the parties intended for the terms set forth in Purchase Order 2254 to be the complete contract between IWR and TAKTL.

Although Purchase Order 2254 does not reference Exhibits A or B, Exhibit A is explicitly identified as an exhibit to "IWR Building Systems Purchase Order 2254." <u>Id.</u> at 13. So, Exhibit A was meant to be construed alongside Purchase Order 2254. And Exhibit A, in turn, incorporates Exhibit B by reference in its "warranty" provision. <u>See id.</u> ("The TAKTL standard 10-year warranty shall be applicable to the materials supplied under this purchase order, as attached hereto in Exhibit B."). This indicates that all three writings were intended to be part of

"one transaction" between IWR and TAKTL, and therefore, should be "read together" and "construed with reference to the other." Huegel, 796 A.2d at 354–55.

Although IWR returned Exhibit A without a signature, it nonetheless agreed to *some* of the terms contained therein.  As discussed above, Youngblood wrote "OK" followed by his initials next to two of the provisions in Exhibit A.  Crucially, the "warranty" clause was one such provision.  Objectively considered, Youngblood's notations next to this clause are strong evidence of IWR's intention to be bound thereto.  This is further supported by Youngblood's email to TAKTL stating the "fully executed PO for the IWR portion of the BJC project(s)" was attached, which included Exhibits A and B in its attachment.  Such outward manifestations of Youngblood's intent show that IWR agreed to the warranty provision, notwithstanding the absence of any signature on IWR's designated line.  See Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 584 (3d Cir. 2009) ("Signatures are not dispositive evidence of contractual intent.").  And because IWR agreed to the provision that incorporated Exhibit B by reference, Exhibit B became part of the IWR Purchase Order.

Next, the limitation of liability provision in Exhibit B bars IWR from recovering only consequential and incidental damages arising from a breach of warranty, but it does not prohibit IWR from recovering such damages wholesale.  When interpreting a contract, "the court must avoid ascribing an interpretation that conflicts with the plain meaning of the language used by the parties or otherwise alters the clear import of the contract." Slavko Props., Inc. v. T.D. Bank, N.A., No. CIV.A. 14-05045, 2015 WL 1874233, at *9 (E.D. Pa. Apr. 24, 2015); see also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010 (3d Cir. 1980) ("A court is not authorized to construe a contract in such a way as to modify the plain meaning of its words, under the guise of interpretation.").

13

Exhibit A describes Exhibit B as TAKTL's "standard 10-year warranty," which is consistent with Exhibit B's subheading that identifies it as a "limited product warranty." Moreover, Exhibit A provides that the remedies contained in Exhibit B "shall be [IWR's] sole and exclusive remedy for *breach of warranty* and all other remedies available at law or in equity are expressly excluded."  Pl. Ex. 1220 at 13 (emphasis added).  The same language appears in the second paragraph of Exhibit B's "Limitation of Liability" provision, which states that TAKTL's liability "for *breach of warranty* hereunder is, in all instances, limited solely and exclusively to one of the following at the option of TAKTL . . . ."  Id. at 14 (emphasis added).

When read in the context of the parties' entire agreement, it is apparent that Exhibit B's limitation of liability provision was only meant to curtail TAKTL's liability for breach of warranty.  To interpret this provision as completely prohibiting IWR from recovering consequential or incidental damages would be an impermissible expansion of the contract's plain language.  Moreover, such an interpretation would require this court to read the limitation of liability provision in isolation, rather than construing the entire contract as a whole.  See AmerisourceBergen Drug Corp., 2021 WL 5631711, at *5.

Accordingly, Exhibit B's limitation of liability provision only bars the recovery of consequential and incidental damages arising from a breach of warranty, but it does not limit TAKTL's liability for a contractual breach outside of such warranties.  And because IWR has not brought a breach of warranty claim against TAKTL, IWR's recoverable damages are not subject to Exhibit B's limitation of liability clause.

### B.  TAKTL's Damages Against IWR

Turning to the limitation of liability provisions relevant to TAKTL's recoverable damages against IWR, we begin with the "changes in specifications" provision found in IWR's terms and conditions:

14

> [IWR] shall have the right by written order to make changes from time to time in the work to be performed or the materials to be furnished by [TAKTL] hereunder. If such changes cause an increase or decrease in the amount due under the order or in the time required for its performance, an equitable claim for adjustment must be asserted in writing fifteen (15) days from the date the change is ordered. Nothing contained in this clause shall relieve [TAKTL] from proceeding without delay in the performance of this order as changed.

Pl. Ex. 1220 at 3.  The first sentence makes clear that this provision is only operative if IWR changed "the work to be performed or the materials to be furnished" by TAKTL.  Thus, the fundamental issue here is whether any of TAKTL's claimed damages arose from a change that IWR properly ordered under this provision.

TAKTL was obligated to submit an "equitable claim for adjustment" if IWR ordered a change that impacted the contract price or the amount of time required for TAKTL's performance.  While neither party argues that the term "equitable claim for adjustment" is ambiguous, they disagree on the requirements it imposed upon TAKTL and its applicability to TAKTL's claimed damages.  While IWR has oscillated somewhat on its proffered interpretation of this term, the court agrees that this provision required TAKTL to submit claims for additional compensation "at the time they accrue[d]," so that "the information about the impact of a change in specifications [was] readily ascertainable, known by the parties, and reliable."  ECF No. 325 at 18.  To conclude otherwise would require the court to interpret TAKTL's fifteen-day time limit to submit such claims as superfluous.

However, the court also agrees with TAKTL that there is no evidence in the record that it was required to submit a change order as the exclusive mechanism for claiming such costs under this provision.  ECF No. 322 ¶ 11.  This conclusion is supported by the contract's language.  The changes in specifications provision provides that IWR could make changes via a "written order," but that TAKTL had to submit a corresponding "equitable claim for adjustment" when such changes impacted the contract's price or timing.  This language suggests that if the parties had

intended for a "change order" to be TAKTL's exclusive mechanism for such claims, the contract would have stated as much.

Upon consideration of the contract's language and the parties' proffered interpretations, the court finds that the changes in specification provision: (1) was only operative if IWR ordered a change in "the work to be performed or the materials to be furnished" by TAKTL; and (2) required TAKTL to submit a written claim asserting a price increase at the time such change was ordered. The applicability of this clause hinges on whether any of the changes to the Project were the result of a change ordered by IWR, rather than an alleged breach of the parties' contract. While the issue of liability is not currently being resolved at this time, if it is later determined that IWR properly ordered a change under this provision, TAKTL will need to show that it submitted a contemporaneous written claim for additional compensation to be entitled to any damages arising therefrom.

As IWR accurately notes, TAKTL simultaneously argues that it complied with the changes in specifications clause, while also maintaining that IWR's conduct made it "impractical or impossible for TAKTL to comply" with this provision. ECF No. 323 at 9. But TAKTL has failed to point to any evidentiary support in the record for its latter argument. Unlike in E. C. Ernst, Inc. v. Koppers Co., there is no evidence that TAKTL could not compute the costs of any changes and submit them to IWR at the time they were ordered. 626 F.2d 324, 330 (3d Cir. 1980). Nor is there any evidence that TAKTL requested the change in specifications provisions be waived in light of such changes or any other action taken by IWR. See id. Rather, TAKTL submitted numerous change orders to IWR between May of 2016 and March of 2017 for costs related to extra drafting hours, custom oversized molds and mold extensions, and replacement panels. Thus, the evidence suggests that TAKTL continued to submit claims for additional costs

throughout the course of the Project without difficulty.  Accordingly, IWR may still rely on the changes in specifications provision to the extent it is applicable.

To clarify, the contract does not provide that *any* work performed by TAKTL outside the scope of the original contract will be subject to this provision.  Some of the damages TAKTL seeks relate to the costs of correcting defects caused by IWR's alleged breaches.  Because neither party alleges that TAKTL performed such work at IWR's request, these damages would not be subject to the changes in specifications provision.  But some of the other damages claimed by TAKTL stem from IWR allegedly breaching the contract by demanding that "TAKTL manufacture the panels on a revised, compressed, and accelerated schedule" and "manufacture more unique parts" than the IWR Purchase Order originally contemplated.  See Verdict Slip (ECF No. 293) at 1–2.  Since TAKTL alleges that IWR "demanded" these changes, the applicability of the changes in specifications provision is a question that will need to be addressed with respect to these claims.

In some situations, Pennsylvania courts have permitted the recovery of costs associated with changes in the scope of work regardless of the plaintiff's compliance with a contract's notice provisions where the plaintiff performed extra work at the defendant's direction, or the defendant had knowledge of the plaintiff's claims and failed to take any corrective action.  See, e.g., E. Coast Paving & Sealcoating, Inc. v. N. Allegheny Sch. Dist., 111 A.3d 220, 227 (Pa. Commw. Ct. 2015) ("[T]he School District demanded the soft spot repair work . . . [it] knew what [this] work involved, and it received written reports on its progress.  It cannot, after the fact, rely upon Section 7.1.1 to refuse to execute a change order or pay for the materials it obligated East Coast to purchase."); James Corp. v. N. Allegheny Sch. Dist., 938 A.2d 474, 486 (Pa. Commw. Ct. 2007) ("School District here clearly knew of the operative facts giving rise to the construction

delays and Contractor's claims for accelerated work . . . School District's failure to act caused the delays.  Thus, the notice provisions of the contract, albeit informally, were satisfied.").

To the extent TAKTL alleges that IWR breached the contract by demanding it manufacture the panels under an accelerated schedule, it will need to show that this was not a change in "the work to be performed or the materials to be furnished" to overcome the changes in specifications provision.  If TAKTL fails to satisfy this burden, the foregoing cases illustrate that TAKTL may still be entitled to damages if it can show that IWR changed the scope of its work under some improper action, such as refusing "to adjust the Project completion date or take other corrective measures," despite having knowledge of the "operative facts" giving rise to TAKTL's claims for accelerated work.  James Corp., 938 A.2d at 486.

As for TAKTL's claim that IWR breached the contract by demanding it manufacture more unique parts than originally contemplated, TAKTL will need to show that IWR directed it to "perform extra work" and knew that TAKTL "was performing the extra work it demanded," such that the parties' conduct "demonstrated their understanding" that the changes in specifications provision was inapplicable.  E. Coast Paving & Sealcoating, Inc., 111 A.3d at 227; see also Universal Builders, Inc. v. Moon Motor Lodge, Inc., 430 Pa. 550, 558, 244 A.2d 10, 15 (1968) ("Thus it is not unreasonable to infer that he was aware that extra work was being done without proper authorization, yet he stood by without protesting while the extras were incorporated into the project.").

At this juncture, the court cannot determine whether the changes in specifications provisions bars TAKTL from recovering any of its claimed damages.  However, the record supports a finding that TAKTL has failed to show that IWR should be estopped from relying on this clause.  Further briefing will be necessary to determine: (1) whether IWR ordered a change

in "the work to be performed or the materials to be furnished;" and (2) if so, whether TAKTL submitted a corresponding claim to adjust the price or timing.

The next limitation of liability provision in the IWR Purchase Order is the "excess quantities" provision found in IWR's terms and conditions, which provided that "[IWR] assume[d] no liability for materials produced, purchased or processed in excess of the amount called for by this order." Pl. Ex. 1220 at 3. IWR argues that this provision bars TAKTL from recovering damages related to yield, scrap, and inventory costs because they "are all associated with TAKTL allegedly having to produce or process materials that were in excess of the amounts called for" by the IWR Purchase Order. ECF No. 319 at 16.

The excess quantities provision does not prohibit TAKTL from seeking damages related to inventory costs. These damages represent the panels that ultimately remained in TAKTL's inventory after IWR "abruptly decided" that it did not want the final shipments that it had ordered for the Project. In light of the fact that "the entire contract should be read as a whole," the court's interpretation of the excess quantities provision "must seek to give effect to all [the] provisions" in the IWR Purchase Order. AmerisourceBergen Drug Corp., 2021 WL 5631711, at *5. Given the changes in specifications provision, as well as IWR's instruction that "[a]ny changes against orders [it] cancel[s] must be invoiced to [it] no later than 10 days after cancellation date," the excess quantities provision cannot be interpreted as barring TAKTL's recovery of inventory costs. Pl. Ex. 1220 at 3.

If the parties had intended for the excess quantities provision to cover cancelled orders or shipments, then it would have been illogical to include an instruction regarding invoice changes for orders cancelled by IWR. Moreover, IWR does not refute that it ordered the panels that ultimately remained in TAKTL's inventory—rather, it asserts that this provision "precludes an award of damages for any material produced or processed by TAKTL that were not ultimately

used in the Project." ECF No. 318 ¶ 22.  But there is a difference between panels that were produced in excess of the amounts called for by the IWR Purchase Order, and panels that were "ultimately not used in the Project."  Because the contract allowed IWR to order certain changes "from time to time" in "the materials to be furnished," the fact that TAKTL had leftover inventory does not necessarily mean that these panels were produced "in excess" of the IWR Purchase Order.  Since IWR has not disputed TAKTL's claim that it *did* order these panels—nor pointed to anything in the record in support of the same—the court finds that the excess quantities provision does not bar TAKTL from seeking damages related to inventory costs.

However, the excess quantities provision prohibits TAKTL from seeking damages related to yield costs.  This conclusion is based in part upon the "price" provision found in IWR's terms and conditions:

> **PRICE** [TAKTL] agrees that the materials, services, or articles specified herein will be furnished at a price no higher than that when last purchased or at a price no higher than that specified herein, unless [IWR] is notified of the new price in writing and [TAKTL] will not proceed with the order until acceptance of the new price by [IWR] is furnished in writing.

Pl. Ex. 1220 at 3.  Lauren Flannery testified that TAKTL included its expected yield percentage in its final quotation to IWR.  See Trial Tr., Nov. 18, 2024 (ECF No. 301) at 94:17–24.  In other words, the price of the IWR Purchase Order was based in part on TAKTL's expectation that 85% of the material it cast would be yielded for fabrication.

When the price provision is read in conjunction with the excess quantities provision, it is clear that TAKTL cannot recover damages for the difference between its expected yield percentage and the actual amount of material it yielded on the Project.  Unless TAKTL notified IWR that the materials would be furnished at a new price due to its reduced yield rate and IWR manifested acceptance of the same, TAKTL cannot recover the costs of producing a higher amount of unyielded material.  Essentially, this material was produced or processed in excess of

the amount called for by the IWR Purchase Order because TAKTL's expected yield percentage was already contemplated therein. Therefore, TAKTL is not entitled to recover damages related to yield costs.

Turning to scrap costs, which represent the high rate of unusable material that TAKTL manufactured for the Project—or, in other words, was forced to "scrap"—compared to the other jobs that it performed that year. Unlike yield costs, TAKTL does not allege that it included an expected "scrap rate" into its price quotation for the IWR scope of work. However, Lauren Flannery testified that TAKTL scrapped 18% of the total cast material for all the jobs it performed in 2016, excluding the Project. This testimony suggests that TAKTL's typical manufacturing process entailed scrapping at least *some* of the total material it cast regardless of the other parties' conduct.

Yet, the language of the excess quantities provision limits IWR's liability only for materials produced "in excess of the amount" called for by the purchase order. Given that TAKTL's panels ultimately were installed on the buildings, any scrapped material was plainly not required for the Project to be completed. At the same time, TAKTL contends that it was forced to discard an inordinate amount of material due to IWR's breaches. That is to say, it asserts that some of the scrapped material *was* called for by the IWR Purchase Order. Thus, the applicability of this provision depends on the meaning of the phrase "in excess of the amount called for by this order." Unlike inventory costs, no other provisions in the IWR Purchase Order offer clarity on whether the excess quantities provision precludes scrap costs.

With respect to the present matter, the dispositive question is whether this provision can be read to limit IWR's liability for excess material arising from a breach of contract. Considering this clause makes no reference to the circumstances under which IWR's liability would be limited, it cannot be interpreted as applying to excess materials resulting from a breach of

contract.  See Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp., 643 F. Supp. 2d 675, 687 (E.D. Pa. 2009) ("The Court is not permitted to construe a contract 'in such a manner as to write a new contract for the parties, but is confined to reasonable construction of the language as actually contained in the writing.'" (quoting CBS Inc. v. Capital Cities Commc'ns, Inc., 448 A.2d 48, 55 (Pa. Super. 1982))); see also Royal Indem. Co. v. Sec. Guards, Inc., 255 F. Supp. 2d 497, 503 (E.D. Pa. 2003) ("Additionally, the limitation of liability provision makes no reference to liability for performance or non-performance under the contract, so liability is neither excluded nor limited for breach of contract.").  Accordingly, the excess quantities provision does not bar TAKTL from seeking damages related to scrap costs.

### C.  TAKTL's Damages Against AGT

The AGT Purchase Order does not contain a provision limiting AGT's liability for breach of contract.  Under Pennsylvania law, "[w]here one party to a contract . . . breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he suffered."  Ferrer v. Trs. of Univ. of Pennsylvania, 825 A.2d 591, 610 (Pa. 2002).  In this context, TAKTL may seek whatever damages it claims to have suffered as a result of AGT's breaches.  Bearing in mind the narrow matter before the court, the absence of a limitation of liability provision requires finding that TAKTL's damages against AGT are permitted at this juncture.

### III.  CONCLUSION

Based on the foregoing, TAKTL and AGT remain subject to liability for all the damages claimed against them.  The determination of whether the "changes in specifications" clause bars any of TAKTL's claimed damages must await further briefing submitted in accordance with the guidance set forth herein; and in this regard IWR is not estopped from relying on that clause.  TAKTL's claim against IWR for damages related to yield costs is barred.  The "excess

quantities" provision does not bar TAKTL from seeking damages related to inventory and/or scrap costs.  In all other aspects, the parties' claims of damages must await further briefing.

Date: November 4, 2025

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc: Brian P. Maloney, Esquire
    Chad Allen Wissinger, Esquire
    Julie A. Mueller, Esquire
    Connor P. Sease, Esquire
    Jayme L. Butcher, Esquire
    Wellford H. Winstead, Esquire
    Brandon A. Levey, Esquire
    Mark A. Packman, Esquire
    Michael Rush, Esquire
    Shawna J. English, Esquire

    (*Via CM/ECF Electronic Mail*)